William H. KENNER, William H. Kenner and Eleanor V. Kenner, and Kenner's Charitable Hospital, Inc., Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 13806.

United States Court of Appeals Seventh Circuit.

June 4, 1963.

Rehearing Denied July 15, 1963.

Cecil L. Cass, Chicago, Ill., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Tax Div., Gilbert E. Andrews, Atty., John B. Jones, Jr., Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before SCHNACKENBERG and SWYGERT, Circuit Judges, and PLATT, District Judge.

SWYGERT, Circuit Judge.

This petition for review is brought by William H. Kenner, his wife Eleanor V. Kenner, and Kenner's Charitable Hospital, Inc., which Dr. Kenner founded and operated. Relief is sought from decisions of the Tax Court redetermining deficiencies in income tax and additions to tax for the years 1944 through 1954 in the total amount of $592,862.90 in respect to the Hospital and deficiencies in income tax and additions to tax for the years 1945 through 1954 in the total amount of $377,739.87 in respect to Kenner.[1]

Because of the extensive number of transactions involved, their complexity, and the length of the findings of fact and opinion filed by the Tax Court, reference to those documents is made. They are reported at 20 CCH Tax Ct. Mem. 185 (1961).

A short summary of the facts as found by the Tax Court is sufficient for our purposes since an examination of the underlying evidentiary facts and factual inferences on which the determinations of that court were based convinces us

that the court's ultimate findings are not clearly erroneous. Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

William H. Kenner is a medical doctor. In 1932, Kenner purchased a building at 716 Wellington Avenue in Chicago, where he had been engaged in private practice. The building was purchased for about $1,000 cash and the assumption of an $8,000 mortgage. One year later, Kenner's Charitable Hospital, Inc., was organized and incorporated under the laws of the State of Illinois. Although the membership of the Hospital board of directors changed from time to time, Kenner was in complete and effective charge of it during all the years of its existence. The Hospital was solely a Kenner family organization. When the Hospital began to function in 1934, Kenner purchased a nearby nurses' home for $1,000 cash and the assumption of an $8,000 mortgage. Both the hospital building and the nurses' home were deeded to the Hospital corporation in 1936.

The Hospital's articles of incorporation, which were amended from time to time, generally provided that its purpose was to provide free, charitable hospital rooms and treatment and not to operate for pecuniary profit. In 1949, after the Hospital had further amended its articles of incorporation, it was approved under the Illinois General Not For Profit Corporation Act.

In the years prior to 1944, Kenner purchased six farms in northern Illinois, and he took an active part in their operation and management. Two bank accounts were maintained by Kenner in his own name in banks in Woodstock and Huntley, towns in Illinois near which some of Kenner's farms were located.

Between 1944 and 1950, two bank accounts were maintained by the Hospital in Chicago banks: in the Aetna State Bank for the period January 1, 1944, to December 10, 1947, and in the City National Bank from December 14, 1946, un-

---

[1] Eleanor V. Kenner is involved only by reason of having filed joint tax returns with her husband for the years 1948 through 1953.

til sometime in 1950. From some time prior to 1944, Kenner indiscriminately commingled his own personal funds and the funds of the Hospital in the latter's bank accounts. No systematic records of any sort were kept by the Hospital until 1949. Although Kenner deposited the proceeds of personal loans, income from his medical practice, and farm receipts not only in his own bank accounts but also in those of the Hospital, the only deposits in the Hospital's bank accounts which can be traced as personal funds of Kenner are $5,253.33 deposited in 1944 and $25,786.98 deposited in 1946.[2]

In 1946, the Hospital sold its old premises and the nurses' home for $60,000 and $15,000, respectively, and a new building was acquired for $155,000. Kenner immediately began to convert the premises into a hospital. The Chicago City Council changed the zoning of the location to permit the operation of a hospital with a capacity of about 65 beds.

The income of the Hospital for the years 1944 through 1947 was determined primarily through the use of the net-worth method. For the years 1948 through 1954, the Hospital's income was determined by using financial statements prepared by the Hospital's bookkeepers. It was stipulated that Kenner withdrew from the Hospital's bank account $75,563.54 in 1947, $60,876.21 in 1948, $49,292.94 in 1949, and $6,686.96 in 1950, and that these amounts were used by Kenner to pay his personal and farm expenses. For the years 1949 through 1954, the income of the Hospital was further diverted to Kenner by payment of his liquor bills, gasoline bills, other farm expenses, and expenses of Kenner's personal residence.

Kenner contends that the sums of money withdrawn from the Hospital's bank accounts for personal uses at all times were less than the amounts deposited by him from non-Hospital sources. We are convinced that the rec-

ord amply supports the Tax Court's refusal to find that the withdrawals by Kenner from the Hospital accounts were limited to funds which he had previously loaned the Hospital. There were no accounting records submitted that tended to prove that bank loans made by Kenner were used, as he contends, to defray Hospital operating expenses and pay for Hospital capital expenditures. Rather, the evidence supports the conclusion, implicit in the Tax Court's findings, that these bank loans were merely devices by which Kenner used the Hospital's bank accounts to drain off hospital funds to pay his personal expenses. No credible evidence was submitted to show that it was Kenner rather than the Hospital who repaid Kenner's bank loans.

We think that the evidence fully supports the Tax Court's finding that "[d]uring the years in question prior to 1950, checks on these [the Hospital's] bank accounts, admittedly in the total sum of at least $230,000 went for the payment of Kenner's farm, personal, and living expenses." We also think the evidence falls short of establishing that no part of the Hospital's net earnings inured to the benefit of Kenner during any of the years in question.

Beginning in 1950, after the Hospital maintained a segregated bank account and had installed an accounting system, Kenner began to use Hospital funds to acquire property in Arizona. A total of $292,873.22 of the Hospital's funds was diverted by Kenner during the years 1950 through 1954; $100,977.75 in 1950, $25,366.33 in 1951, $27,583.20 in 1952, $58,823.06 in 1954, and $80,122.88 in 1955.

Shortly after Kenner formed the Altar Land and Cattle Company in the spring of 1950, Altar purchased the Royal Hotel and El Sahurao Apartments in Tucson, Arizona, and the Lazy-V Ranch, which was about 25 miles from Tucson. The hotel and apartments cost $140,000 and the ranch $85,000. In 1953, Kenner pur-

2. Petitioner Kenner urges otherwise, but speculation and conjecture by the taxpayer after the fact hardly constitute suf-

ficient credible evidence upon which the Commissioner may rely in determining deficiencies.

chased for $43,750 the Hill House property, 10.8 acres which had been excepted from the original purchase of the Lazy-V. Hospital funds were used in the acquisition of each of these properties and for their operation and improvement.

Kenner testified that the improvements, repairs, and other expenditures on the Arizona properties were preparatory to construction of a sanitarium. The sanitarium never came into existence, if indeed it was ever contemplated, and again we find nothing in the record sufficient to induce us to set aside the findings of the Tax Court that the properties were operated as investment properties for the profit of Kenner and the Altar Land and Cattle Company.

Altar sold the Royal Hotel and El Sahurao Apartments in December, 1951, for $135,000. During the time these properties were owned by Altar, they were operated by a resident manager hired by Kenner. Altar reported gross income from rents of $13,750 on its 1951 income tax return.

That portion of the Lazy-V known as the Hill House property was conveyed by Kenner to a trustee in 1954, subject to the instructions of the beneficiaries (principally Kenner and family). The fact that it was subsequently conveyed in 1957 to the Hospital might have supported Kenner's Hospital-benefit theory except for the fact that this latter transfer took place after the initiation of a tax investigation. We believe the record supports the Tax Court's determination that the Hospital funds expended for the Arizona properties during the years 1950 through 1954 were expended for Kenner's benefit and are properly chargeable to him as income during those years.

■ We think it clear that the factual determinations of the Tax Court are fully supported by the record. Certainly they are not clearly erroneous. The detailed treatment accorded the many transactions bear out that court's ultimate findings. Kenner's arguments before this court constitute an attempt to have us sit in judgment of his credibility and his memory since there is little else to support his contentions. The Tax Court had the benefit of demeanor testimony. The evidence and the inferences to be drawn from it would make it difficult for a trier of the facts to believe Kenner's version of his financial relationship with the Hospital including his testimony that he acquired the Arizona properties for the construction of a sanitarium to be owned ultimately by the Hospital. The burden was upon the Hospital and Kenner to prove to the Tax Court that the Commissioner's determinations were incorrect. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935). It is evident their proof fell far short of that. Helvering v. Nat. Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346 (1938).

■ This appeal requires us to treat one more of petitioners' contentions. Kenner's Charitable Hospital, Inc., argues that Sections 3813(a) (5) and 3813 (b) of the 1950 Amendment of the Internal Revenue Code of 1939 and Sections 503(a) and 503(b) (5) of the Internal Revenue Code of 1954 shield it from liability for taxes despite the fact that the Commissioner and the Tax Court found that for each year in question the Hospital was unable to sustain its burden of proof that no part of its net earnings inured to the benefit of Kenner.

The legislation in question defined specific "Prohibited Transactions," which, if engaged in by organizations described in Section 101(6), 26 U.S.C. 1952 ed., § 101(6), of the 1939 Code, or its successor Section 501(c) (3), 26 U.S. C. 1958 ed., § 501(c) (3), of the 1954 Code,[3] would cause them to lose their tax exemption. The prohibited transactions are: (1) lending income or corpus without adequate interest or security; (2) payment of excessive compensation for

---

3. For our purposes Section 101(6) of the 1939 Code and Section 501(c) (3) of the 1954 Code are similar. Section 501 reads:

"Exemption from tax on corporations, certain trusts, etc.

"(a) Exemption from taxation.—An organization described in subsection (c)

personal services; (3) making services available on a preferential basis; (4) purchasing property for more than adequate consideration; (5) selling securities or other property for less than adequate consideration; (6) engaging in any other transaction substantially diverting income or corpus, in dealings with (1) the creator or substantial donor of the organization, or (2) any member of the family of such creator or donor, or (3) any corporation controlled by such creator or donor.[4]

The Hospital argues that since it was excepted from the provisions of Section 3813 of the 1939 Code and Section 503 of the 1954 Code, it automatically falls outside the "inurement of benefit test" of Section 101(6) of the 1939 Code and Section 501(c) (3) of the 1954 Code. This argument could succeed only if we accepted the proposition that Congress intended to replace the provisions of the "inurement of benefit" qualification in Section 501(c) (3) as the first step toward achieving tax exempt status for charitable hospitals. If Congress desired to do this it used an extremely inappropriate means to accomplish its purpose. Section 503 and its predecessor in the 1939 Code specifically mention that their terms are to apply to those organizations described in Section 501, so Congress

was well aware of the "inurement of benefit" test of that section. We believe that the exception of hospitals from the additional prohibited transactions in Section 503 of the 1954 Code was not intended to relieve hospitals from the more basic provisions of Section 501, which include the "inurement" test.

The Hospital filed an exemption affidavit on August 26, 1949, which represented, among other things, that no part of its net earnings inured to the benefit of any private shareholder or individual. On the basis of these representations, a ruling of tax-exempt status was issued by the Commissioner by letter dated October 10, 1949. Following an investigation, this ruling was revoked by the Commissioner in a letter dated September 11, 1951. Section 3791(b) of the 1939 Code provides, in effect, that rulings shall be revoked retroactively unless the Secretary of the Treasury or the Commissioner provide otherwise. The retroactive revocation of rulings obtained through misrepresentations of fact does not constitute an abuse of administrative discretion. Birmingham Business College, Inc. v. Commissioner, 276 F.2d 476 (5th Cir., 1960).

Petitioners failed to carry their burden of proof in any respect. The Hos-

---

or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, or 504.

    *       *       *       *       *

"(c) List of exempt organizations.— The following organizations are referred to in subsection (a):

    *       *       *       *       *

"(3) Corporations, * * * organized and operated exclusively for * * * charitable, * * * purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, * * *." (Emphasis supplied).

4. Section 3813 of the 1939 Code and Section 503 of the 1954 Code, for our purposes are substantially similar.
Section 503 reads in part:
    "§ 503. Requirements for exemption.
    "(a) Denial of exemption to organizations engaged in prohibited transactions.—

"(1) General rule.—An organization described in section 501(c) (3) which is subject to the provisions of this section shall not be exempt from taxation under section 501(a) if it has engaged in a prohibited transaction after July 1, 1950; and an organization described in section 401(a) which is subject to the provisions of this section shall not be exempt from taxation under section 501(a) if it has engaged in a prohibited transaction after March 1, 1954.

    *       *       *       *       *       *

"(b) Organizations to which section applies.—This section shall apply to any organization described in section 501 (c) (3) or section 401(a) except—

    *       *       *       *       *       *

"(5) an organization the principal purposes or functions of which are the providing of medical or hospital care or medical education or medical research or agricultural research. * * *"

pital failed to prove that it was entitled to exempt status since portions of its net income inured to the benefit of Kenner.

The decisions of the Tax Court are affirmed.