The **FOUNDING CHURCH OF SCIENTOLOGY**

v.

The **UNITED STATES.**

No. 226–61.

United States Court of Claims.

July 16, 1969.

Ronald Dreier, New York City, for plaintiff, Bella L. Linden, New York City, attorney of record. David Blasband, Peter C. Clapman, and Linden & Deutsch, New York City, of counsel.

Michael I. Sanders, Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant. Philip R. Miller and Norman J. Hoffman, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION *

COLLINS, Judge.

This is a suit to recover Federal income taxes and assessed interest paid by plaintiff to defendant for the fiscal year ended June 30, 1956. Defendant has counterclaimed for taxes assessed but unpaid for the fiscal years ended June 30, 1956, June 30, 1958, and June 30, 1959. The central issue presented is whether plaintiff is entitled to an exemption from Federal income taxation. The pertinent statute is section 501(c) (3) of the Internal Revenue Code of 1954, which includes among those organizations exempt from taxation a corporation "organized and operated exclusively for religious * * * or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private *shareholder or individual* * * *."

The facts set forth in detail in the findings can be briefly summarized to the extent pertinent here:

Plaintiff is a District of Columbia corporation organized in 1955 with its purpose, as stated in the Certificate of Incorporation, "[t]o act as a parent church for the propagation of the religious faith known as 'Scientology,' and to act as a Church for the religious worship of that Faith." The beliefs of Scientology center around the spirit or "thetan," which is said to reside within the physical body of every human being. Scientologists believe that the spirit is immortal and that it receives a new body upon the death of the body in which it then resides. They also believe that in the course of its various lives the spirit is inhibited by "detrimental aberrations," or "engrams," which result from misdeeds or unpleasant experiences.

The objective of Scientology is to counteract this burden through "processing," also called "auditing." This objective which is the principal practice of Scientology, attempts to make the person being audited, called a "preclear," aware of these aberrations and engrams and thus reduce the burdens and inhibitions affecting his spirit. Processing is performed by ministers of the plaintiff, or persons studying to become ministers, and is done in individual sessions with an auditor processing a single preclear through the use of a Hubbard Electro-Meter or "E-Meter." The E-Meter is an instrument which indicates changes in electrical resistance in the preclear's body, and changes in such resistance are viewed as an index of the activity of the spirit. (See finding 10, *infra*.)

Scientology is derived from the thoughts and writings of one L. Ron Hubbard. Its origin was an article written by Hubbard in the May 1950 issue of ASTOUNDING SCIENCE FICTION magazine, describing a new "science" called *Dianetics*. Dianetics, the creation of Hubbard, was offered primarily as a psychotherapeutic technique and was not presented as a religious discipline. Like its successor, Scientology, Dianetics employed a Hubbard E-Meter in its practice. In 1952 Hubbard began to focus his attention and his energies upon Scientology. He founded the plaintiff organization and completely dominated every aspect of its affairs during the relevant period. At the same time he continued to direct the growth and affairs of Scientology organizations throughout the world.

Persons coming to plaintiff for processing were usually required to sign a contract for a stated amount of auditing. The normal contract covered 25 hours of processing at a rate of $20 per hour. Other blocks of processing were available, and the per-hour fee was slighty lower for larger amounts. In addition to proc-

---

* The court is indebted to Trial Commissioner Donald E. Lane (now Judge, U.S. Court of Customs and Patent Appeals) for his opinion, findings of fact, and recommended conclusion of law. Although the court reaches the same result, we decide the case on a different ground.

essing, another department of plaintiff offered various courses or training programs, and such instruction was also performed under contract for comparable fees. Most students enrolled in these courses were studying to become auditors and/or ministers of Scientology. Applicants were often required to contract for processing at the standard fee before being allowed to enroll as students.

During the period in issue, more than 90 percent of plaintiff's income was received from the sales of processing and training services, including sales of E-Meters. Additional income was realized from the sales of examinations and tests, tapes, and books, from minimal donations, and from various other sources. Plaintiff's gross receipts were $102,604 for the fiscal year ending June 30, 1956; $179,491 for the fiscal year ending June 30, 1958; and $247,674 for the fiscal year ending June 30, 1959.

For his services to plaintiff, Hubbard was paid a salary of $125 per week from plaintiff's inception through March 29, 1957; during the period October 26, 1956, through March 29, 1957, he also received an additional $125 per week which was designated as a "fee." On March 29, 1957, plaintiff adopted a compensation scheme (known as the "proportional pay plan") whereby Hubbard was paid, in lieu of salary, 10 percent of the gross income of plaintiff. Other Scientology congregations, franchises, and organizations also paid Hubbard a portion of their gross income, usually 10 percent. In addition, Hubbard received royalties on his numerous Scientology books, as well as lecture fees and other incidental income.

During the taxable years in issue, Mary Sue Hubbard and L. Ron Hubbard, Jr., the wife and son of plaintiff's founder, were compensated employees of the corporation. Also, from June 1957 through February 1959, plaintiff issued weekly checks to Kay Hubbard, the daughter of L. Ron Hubbard.

Defendant's position, briefly stated, is that plaintiff fails to qualify for the statutory exemption because (1) its sales of processing and training services constituted a substantial commercial (and hence nonexempt) purpose, and (2) a portion of its net earnings inured to the benefit of private individuals. Plaintiff denies both contentions.

It is our opinion that plaintiff has failed to prove that no part of the corporation's net earnings inured to the benefit of private individuals, and plaintiff is not entitled to recover. The court finds it unnecessary to decide whether plaintiff is a religious or educational organization as alleged, since, regardless of its character, plaintiff has not met the statutory conditions for exemption from income taxation. In any event, the Government has not raised this issue. Because of the manner in which the second question framed by the parties is resolved, we need not and do not determine whether plaintiff's operations were exclusively for religious or educational purposes.

Implicit in section 501 is the recognition that certain institutions and organizations exist and function for purposes which Congress deems beneficial to society as a whole. In order to foster these aims, funds which would otherwise be acquired and expended for the public good by the Government are left by Congress in the hands of these organizations to be used in furtherance of their beneficial ends. *See* Duffy v. Birmingham, 190 F.2d 738, 740 (8th Cir. 1951). For that reason, it has been held that the exemption provisions should be liberally construed. *E.g.,* American Institute for Economic Research v. United States, 302 F.2d 934, 157 Ct.Cl. 548 (1962), cert. denied, 372 U.S. 976, 83 S.Ct. 1109, 10 L.Ed.2d 141, rehearing denied, 373 U.S. 954, 83 S.Ct. 1677, 10 L.Ed.2d 708 (1963).

The statutory language also makes it eminently clear, however, that Congress intended to extend the exemption only when the sole beneficiary of the institutional operations was the public at large. The substantial import of this express limitation cannot be ignored.

*See* Better Business Bureau of Washington, D. C., Inc. v. United States, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67 (1945). The congressional intent behind the conditional language of section 501 (c) (3), coupled with the burden of proof placed upon the taxpayer in these circumstances (*see, e.g.*, Kenner v. Commissioner of Internal Revenue, 318 F.2d 632 (7th Cir. 1963); Cleveland Chiropractic College v. Commissioner of Internal Revenue, 312 F.2d 203, 206 (8th Cir. 1963)), requires plaintiff to clearly demonstrate its right to exemption. *See* New Jersey Auto. Club v. United States, 181 F.Supp. 259, 149 Ct.Cl. 344 (1960), cert. denied, 366 U.S. 964, 81 S.Ct. 1913, 6 L.Ed.2d 1255 (1961).

The term "net earnings" in the inurement-of-benefit clause, as stated in section 501 and its predecessor, section 101 of the Internal Revenue Code of 1939, has been construed to permit an organization to incur ordinary and necessary expenditures in the course of its operations without losing its tax-exempt status. Birmingham Business College, Inc. v. Commissioner of Internal Revenue, 276 F.2d 476 (5th Cir. 1960); Enterprise Ry. Equip. Co. v. United States, 161 F. Supp. 590, 142 Ct.Cl. 192 (1958); Mabee Petroleum Corp. v. United States, 203 F. 2d 872 (5th Cir. 1953); Broadway Theatre League of Lynchburg, Va., Inc. v. United States, 293 F.Supp. 346, 355 (W.D.Va.1968).

By analogy to the recurrent tax question in the business sphere, whether corporate officers' salaries are reasonable and deductible, or are excessive and disguise the distribution of dividends (*see, e. g.*, Jones Bros. Bakery, Inc. v. United States, 188 Ct.Cl. ——, 411 F.2d 1282 (June 1969)), several decisions indicate that the payment of reasonable salaries by an allegedly tax-exempt organization does not result in the inurement of net earnings to the benefit of private individuals. Birmingham Business College, Inc. v. Commissioner of Internal Revenue, *supra* 276 F.2d at 480; Enterprise Ry. Equip. Co. v. United States, *supra*; Mabee Petroleum Corp.

v. United States, *supra* 203 F.2d at 876. Of course, as the *Birmingham Business College* and *Mabee Petroleum* cases hold, excessive salaries do result in inurement of benefit. *Cf. also* Duffy v. Birmingham, *supra*. As always, whether the salaries paid are reasonable is a question of fact. *Compare, e.g.*, Mabee Petroleum Corp. v. United States, *supra* 203 F.2d at 875, *with* Jones Bros. Bakery, Inc. v. United States, *supra*, and cases cited.

It is clear, however, that an organization's net earnings may inure to the benefit of private individuals in ways other than by the actual distribution of dividends or payment of excessive salaries. General Contractors' Ass'n of Milwaukee v. United States, 202 F.2d 633 (7th Cir. 1953) (reports and surveys furnished to members); Chattanooga Auto. Club v. Commissioner of Internal Revenue, 182 F.2d 551 (6th Cir. 1950) (services to members); Underwriters' Laboratories, Inc. v. Commissioner of Internal Revenue, 135 F.2d 371 (7th Cir.), cert. denied, 320 U.S. 756, 64 S.Ct. 63, 88 L.Ed. 450 (1943) (reports and studies furnished); Spokane Motorcycle Club v. United States, 222 F.Supp. 151 (E.D.Wash.1963) (goods, services, and refreshments given), and cases cited. That the benefit conveyed may be relatively small does not change the basic fact of inurement. Spokane Motorcycle Club v. United States, *supra*.

We scrutinize the facts of the instant case in the light of these principles. According to the trial commissioner's findings, L. Ron Hubbard received over $108,000 from plaintiff and related Scientology sources during the 4-year period June 1955 through June 1959. This figure represents $77,460 in fees, commissions, royalties, and compensation for services, plus $13,538 in payment for expenses incurred in connection with his services, as well as a total of $17,586 in reimbursement for expenditures made in plaintiff's behalf, in repayment of loans made to plaintiff and the New York organization, and as a loan from plaintiff to Hubbard. As the commissioner found, and we agree, the precise nature of the

loans and reimbursed expenditures does not appear in the record. Nor do we find any explanation for most of the expenses paid. The portion of the $77,460 actually paid by plaintiff amounted to approximately $6,000 in 1955–56, more than $11,550 in 1956–57, approximately $18,000 in 1957–58, and over $22,000 in 1958–59.

Hubbard also had the use of an automobile at plaintiff's expense. During plaintiff's taxable years ending in 1958 and 1959, the organization provided and maintained a personal residence for Hubbard and his family. Moreover, in addition to all the foregoing, Hubbard received a percentage (usually 10 percent) of the gross income of affiliated Scientology organizations.

For purposes of deciding this case, we do not consider the income accruing to Hubbard from the affiliated congregations and organizations as coming from plaintiff. However, under the circumstances here, the fact that Hubbard had income from such closely related sources indicates that Hubbard's compensation from plaintiff was not for full-time service. During the years in issue these other percentages, fees, and commissions, so far as the record shows, were apparently received or receivable by Hubbard for his personal use. Such an arrangement suggests a franchise network for private profit and, in turn, casts doubt upon the propriety of the payments by plaintiff to Hubbard and the members of his family. The fact that Hubbard was the recipient of income from plaintiff in the form of royalties and commissions likewise occasions an inference of personal gain.

In this regard, we note the steady increase in Hubbard's compensation. Originally salaried at $125 per week, Hubbard received $250 the following year, $125 of which is described merely as a "fee." In March of 1957, Hubbard began to receive 10 percent of plaintiff's gross income. Although the organization's gross receipts in fiscal year 1957–58 were less than in fiscal year 1956–57, Hubbard's income pattern is still one of growth.

Moreover, the record supports the conclusion that plaintiff and Scientology generally have consistently grown since the years in issue, while Hubbard, or his communication center in England, has continued to receive a percentage of the income of plaintiff and affiliated organizations.

When, with this general background, we consider that Hubbard, the dominant figure in Scientology, and his wife were two members of plaintiff's 3-man board of trustees during the relevant period, it is not inappropriate to require plaintiff to justify the payments made to Hubbard and his family in the nature of loans, reimbursements for expenditures in plaintiff's behalf, for expenses, and other purposes. Not only can these payments, in the absence of explanation, be properly attributable to the individuals as income (cf. Parker v. Commissioner of Internal Revenue, 365 F.2d 792 (8th Cir. 1966), cert. denied, 385 U.S. 1026, 87 S.Ct. 752, 17 L.Ed.2d 674 (1967); see also Kenner v. Commissioner of Internal Revenue, 318 F.2d 632 (7th Cir. 1963)), but the logical inference can be drawn that these payments were disguised and unjustified distributions of plaintiff's earnings.

In addition to the unexplained amounts received by Hubbard described above, his family received the following additional payments entirely, or almost entirely, from plaintiff:

Mary Sue Hubbard, the wife of plaintiff's founder, had income from September 1955 through December 1958 by virtue of renting property owned by her to plaintiff. Her total receipts from this venture were $10,685. Payments amounting to $1,450, attributable to the debts of her son, were made in 1956 and 1957. A completely unexplained figure of $250 and loans of $800 were received in 1958–59.

L. Ron Hubbard, Jr., was the recipient of loans in 1955–56 and 1958–59 totaling $1,226. He was reimbursed for expenditures of approximately $200 in behalf of plaintiff in 1957–58 and 1958–59.

In fiscal years 1957–58 and 1958–59, Kay Hubbard, the daughter, received payments, generally designated as salary or wages, totaling $3,242. The record is devoid of any evidence showing services performed by Miss Hubbard for plaintiff. This amount includes loans of $550 made in 1958.

What emerges from these facts is the inference that the Hubbard family was entitled to make ready personal use of the corporate earnings. *Cf.* Birmingham Business College, Inc. v. Commissioner of Internal Revenue, *supra* at 276 F.2d 480. We have no evidence that the rental paid by plaintiff for Mrs. Hubbard's property was reasonable, or that such an arrangement was beneficial or desirable to the corporation. Inflated rental prices can amount to inurement of benefit. *See* Texas Trade School v. Commissioner of Internal Revenue, 272 F.2d 168 (5th Cir. 1959).

Similarly, the purpose of the loans made to the Hubbards is unexplained. We do not know whether the terms were financially advantageous to plaintiff or whether in fact the loans were ever repaid. Indeed, the very existence of a private source of loan credit from an organization's earnings may itself amount to inurement of benefit. For comparable reasons, the proof concerning the payments for expenses and expenditures in behalf of plaintiff is also defective.

In substance, then, nothing we have found in the record dispels the substantial doubts the court entertains concerning the receipt of benefit by the Hubbards from plaintiff's net earnings. Since plaintiff has failed to meet its burden of proof, we hold therefore that a part of the corporate net earnings was a source of benefit to private individuals.

In this regard, we think it immaterial whether the benefit is viewed as inuring to Hubbard—by easing his obligation to support his family—or directly to the respective members of the family. All the Hubbards were persons "having a personal and private interest in the activities of the organization." Treas.Reg. § 1.501(a)–1(c).

■ The extent of the seeming benefit to Hubbard's family might appear relatively small, but plaintiff has not suggested that it was *de minimis,* and we cannot so conclude from the evidence before us. It is our opinion, from an examination of the statute and the decided cases, that Congress, when conditioning the exemption upon "no part" of the earnings being of benefit to a private individual, specifically intended that the amount or extent of benefit should not be the determining factor. *See* Spokane Motorcycle Club v. United States, *supra.*

With respect to Mr. Hubbard, plaintiff seeks to bring itself within the doctrine of the cases cited above which hold that reasonable salaries paid by a corporation do not result in inurement of benefit to private individuals. Even had the compensation paid to Hubbard been demonstrably reasonable, however, this showing would not remedy the defects in proof concerning the additional payments to Hubbard, or, of course, his family. If in fact a loan or other payment in addition to salary is a disguised distribution or benefit from the net earnings, the character of the payment is not changed by the fact that the recipient's salary, if increased by the amount of the distribution or benefit, would still have been reasonable.

■ For all the above reasons, therefore, the court concludes that plaintiff has failed to prove its entitlement to exemption from income taxation under section 501(c) (3) of the Internal Revenue Code of 1954. Plaintiff's claim is denied, and the petition is dismissed. Defendant is entitled to prevail on its counterclaims. In accordance with the stipulation of the parties, as reflected in unchallenged findings of the commissioner, judgment is entered for defendant in the amounts of $3,262.75 for the fiscal year ending June 30, 1956, $5,399.03 for the fiscal year ending June 30, 1958, and $7,381.97 for the fiscal year ending June 30, 1959. As part of the judgment, defendant is entitled to statutory interest of 6 percent on all three sums from the respective appropriate dates.