THE LABRENZ FOUNDATION, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Labrenz Foundation, Inc. v. Commissioner
Docket No. 5175-73.
United States Tax Court
T.C. Memo 1974-296; 1974 Tax Ct. Memo LEXIS 23; 33 T.C.M. (CCH) 1374; T.C.M. (RIA) 740296; November 26, 1974, Filed. John F. Papsidero, for the petitioner. Stephen M. Miller, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in petitioner's income tax for 1970 in the *24 amount of $3,063.05, plus an addition to tax under section 6651(a) [1] in the amount of $612.61. The issue for decision is whether petitioner was exempt from Federal income taxes during 1970 under section 501(c) (3). The answer depends upon whether petitioner was operated exclusively for charitable, religious, scientific, or educational purposes and whether any part of its earnings inured to the benefit of any individual. FINDINGS OF FACT Petitioner, a corporation organized under the Membership Corporation Law of New York on October 23, 1967, had its principal offices in Orchard Park, New York, at the time its petition was filed. The certificate of incorporation states that the trustees designated to serve until the first annual meeting were Dr. Walter S. Labrenz (Dr. Labrenz), Mary D. Labrenz, his wife, and Adele S. Labrenz (hereinafter referred to as Adele), his mother. The certificate of incorporation contains the following pertinent provisions: SECOND: The purposes for which the corporation is to be formed are: To receive and *25 maintain a fund or funds of real or personal property, or both, and subject, to the restrictions and limitations hereinafter set forth, to use and apply the whole or any part the income therefrom and the principal thereof exclusively for religious, scientific, literary or educational purposes either directly or by contributions to organizations duly authorized to carry on religious, scientific, literary or educational activities * * * The income and principal will be used to accomplish research and development exclusively in the fields of education, literature, science and religion. All scientific research will be made available to the public on non-discriminatory basis. No part of the net earnings of the Corporation shall inure to the benefit of any member, trustee, officer of the Corporation of [sic] any private individual except that reasonable compensation may be paid for services rendered to or for the Corporation effecting one or more of its purposes. * * * Pursuant to sections 1.501(a)-1 and 1.501(c) (3)-1, Income Tax Regs., petitioner (sometimes referred to herein as the foundation) applied for a ruling that it was exempt from Federal income taxes, and on January 29, 1968, the *26 district director of internal revenue issued the requested ruling. The minutes of a meeting of February 8, 1968, of petitioner's board of directors, consisting of Dr. Labrenz, his wife, and his attorney, show the adoption of the following resolutions: The Chairman reflected that at the outset the Foundation should remain in the education and scientific area, and, regarding education, it should establish a program for the granting of scholarship or loans to deserving students and the dissemination and publication of literature to the general public regarding the benefits of Chiropractics. After discussion and deliberation, it was unanimously RESOLVED, that the officers of the Foundation are authorized to establish a committee known as the Scholarship Committee in order to prepare a format and guideline for the receipt of applications for scholarships, grants and loans and the committee would be further empowered to screen the applicants and decide which applicant would receive a scholarship, grant or laons [sic]; and it was further RESOLVED, that the officers of the Foundation, be and hereby are authorized to commence and institute a program to study Chiropractic methods; *27 to do research into the causes for disorders of a physical nature, plaging [sic] modern man and to establish a clinic to diagnose and treat patients for study in this research program and to publish and disseminate the findings of this program to the general public, chiropractors and institutions concerned with medical research and chiropractic research. * * * By letter dated February 25, 1970, the district director of internal revenue revoked the income tax exemption ruling previously granted petitioner. That revocation was effective for taxable periods beginning on or after January 1, 1968. Thereafter, respondent determined the income tax deficiency here in dispute. Dr. Labrenz, president of petitioner and its executive director, has been a licensed chiropractor for more than 30 years. In 1955, he was taught the Toftness Method of Spinal Correction at the Toftness Postgraduate School of Chiropractic in Cumberland, Wisconsin, and since 1955 has used that method in carrying on his practice. Prior to the formation of petitioner, Dr. Labrenz practiced as a self-employed chiropractor and received most of his income from fees for professional services. On January 1, 1968, Adele, *28 who was confined to a nursing home, transferred to petitioner a parking lot in Fort Wayne, Indiana, in exchange for an annuity to be paid to her at the rate of $300 per month for her lifetime. Also, by letter dated January 1, 1968, Adele instructed petitioner to use the annuity payments to defray her personal living expenses "in lieu of making payments" to her. Although the annuity agreement states that the parking lot had a fair market value of $90,000, the lot had a book value of $2,700, and this latter figure was reflected by petitioner on its initial income tax return for 1968. Thereafter, petitioner made certain payments to or on behalf of Adele each month and made other more frequent payments for incidentals. These payments were made to the nursing home, to doctors, or for drugs. The amounts paid over and above the annuity for incidentals were substantial, and in fact exceeded the $300-per-month annuity payments. During 1970 petitioner made payments to or on behalf of Adele totaling $7,780.38 to cover her nursing home expenses, medicine, and hospital bills. Prior to the formation of petitioner, Dr. Labrenz maintained his office and his residence at 3405 Orchard Park *29 Road (sometimes referred to as 3405 Orchard). On their joint Federal income tax return for 1968, Dr. Labrenz and his wife treated this property as being used 75 percent as a personal residence and 25 percent as an office. On or about April 1, 1968, Dr. Labrenz transferred three pieces of real property to petitioner: (1) 3405 Orchard; (2) a two-family house in which Adele resided, identified as 3415 Orchard Park Road; and (3) a vacant lot known as 3425 Orchard Park Road. Adele held a mortgage on the vacant lot, and Dr. and Mrs. Labrenz were making payments on the mortgage at the rate of $200 per month. As of December 31, 1968, the mortgage payable to Adele was $18,570.50. Petitioner did not assume the mortgage payable from Dr. and Mrs. Labrenz to Adele, but petitioner thereafter made the mortgage payments. During 1968 Dr. Labrenz transferred to petitioner a 1967 Chrysler automobile, X-ray equipment, examination tables, office furniture, and various other items of furniture and equipment. During 1970 Adele lived at 3415 Orchard Park Road. Petitioner charged Adele $75 per month as rent. Each month petitioner, as agreed in a letter dated April 1, 1968, set off the rental *30 payment due from Adele against the mortgage payment to Adele for which Dr. and Mrs. Labrenz were liable, and expended the $125 balance for Adele's benefit. During 1969 petitioner paid $1,687.90 on the mortgage, and paid it off completely in 1970. The real and personal property transferred by Dr. Labrenz to petitioner was reflected on petitioner's books at Dr. Labrenz" cost, which was $33,098.34. Petitioner assumed a liability to Dr. Labrenz for that amount. Petitioner made no payments on this liability during 1968, but paid $716.62 thereon during 1969 and $10,908.38 during 1970, leaving a balance due of $21,473.74. On petitioner's return for 1970, this liability was referred to as a loan due Dr. and Mrs. Labrenz. The real and personal property which Dr. Labrenz transferred to petitioner at his cost had been purchased over a period of years beginning in 1940, and depreciation had been claimed thereon on his personal income tax returns. On March 31, 1968, Dr. Labrenz and petitioner entered into an employment agreement for a period of 1 year at a salary of $300 per month, containing the following pertinent provisions: WHEREAS the Foundation is a tax exempt corporation and *31 one of the purposes upon which it received its tax exempt status is research in the field of chiropractic for the betterment and improvement of the health of mankind; and WHEREAS it has instituted a research program in the field of chiropractic and has purchased equipment and property in order to operate its' [sic] research facilities; and WHEREAS Walter S. LaBrenz [sic] is licensed to practice Chiropratic in the State of New York and has offered his services as the Director of the Chiropratic Research Program of the Foundation. NOW, THEREFORE, it is agreed as follows: 1. The Foundation hereby employes [sic] Walter S. LaBrenz [sic] as Director of its program of research in the field of chiropractic for the annual salary of thirty-six hundred dollars ($3600.00) payable $300.00 per month. * * * 3. LaBrenz [sic] agrees to devote full time and energy necessary and required by the Foundation in its' [sic] research program and will diagnosis [sic] and treat all patients of the Foundation; LaBrenz [sic] further agrees that he will maintain adequate records and case histories of each patient and will submit quarterly" [sic] reports to the Board of Directors *32 of the Foundation regarding the number of patients he has treated in the preceding quarter, the method of treatment, the diagnosis of the patient and whether the patient is completely relieved or cured of his illness or disorder and will make other reports as may from time to time [be] required by the Foundation. 4. LaBrenz [sic] agrees that during the term of his employment with the Foundation he will not engage in general practice and that he will treat only patients of the Foundation at the Foundation's offices. 5. The Foundation agrees to furnish LaBrenz [sic] the necessary supplies and materials and equipment for the operation of the Chiropractic office; an automobile, hospitialization insurance and such other fringe benefits as are normally given an Executive employee and which may be agreed upon by the parties from time to time during the period of this contract. Although the contract has been extended, it has not been formally revised. During 1968 through 1970, petitioner paid Dr. Labrenz cash compensation as follows: 1968
$3,172.60
1969
4,173.60
1970
4,398.60
Petitioner paid no cash compensation to any other person. During 1970 Dr. *33 Labrenz and his family lived rent-free at 3405 Orchard. Petitioner paid all the expenses arising from the use of 3405 Orchard, including heat, electricity, real estate taxes, water, repairs, and maintenance. The heating bill averaged $28 per month, and the electric bill averaged $30 per month. Dr. Labrenz and his family had unlimited use of the 1967 Chrysler automobile, and petitioner defrayed all expenses arising from its use, including gasoline and oil, repairs, and insurance. Petitioner paid insurance premiums on the life of Dr. Labrenz in the amount of $848, for which it deducted the amount of $273 on its income tax return for 1970. The office space in 3405 Orchard, used by Dr. Labrenz, consisted of 5 small rooms. The residential portion consisted of a living-dining room, 3 bedrooms, a porch, and a kitchen. The residential portion of the building was much larger than the office portion, and it had a fair rental value of not less than $250 per month. The expenses incurred by petitioner in maintaining and operating this residence-office were the same as the expenses incurred by Dr. Labrenz prior to petitioner's formation. After petitioner was formed, Dr. Labrenz continued *34 to perform chiropractic services at 3405 Orchard as he had in the past. His office hours were not changed. The fees in 1968 were the same as in 1967, and they were increased after 1968 from time to time to conform to customary rates. The standard used to set fees was the charges made by others in the profession. At no time has petitioner held itself out to the public as a source of chiropractic services for charity patients. As far as Dr. Labrenz knew, every patient who came to his office to receive care would be expected to pay the regular fee. The sign outside of the building read: "W. S. Labrenz, Chiropractor, 3405 Orchard Park Road." Only those patients who failed to pay their bills were referred to as charity patients. Petitioner received the following chiropractic fees and real property rentals: Year
Chiropractic Fees
Rentals 1968 (April 1 to Dec. 31)
$ 9,031.80
$6,750.00
1969
16,086.00
9,000.00
1970
16,287.50
9,127.00
Dr. Labrenz has always maintained cards on his patients, and he continued to do so after petitioner was organized. Beginning in 1968, he began compiling statistics on new patients from these patient cards, arranging *35 the information on a monthly basis. The compilation shows as to each new patient the name, sex, age, marital status, whether he had received previous chiropractic treatment, whether an X-ray was recommended, the nature of the distortion, the outcome of the chiropractic adjustment, and certain other data.The entries in the "outcome" column were one of the following abbreviations with the indicated meaning: Outcome
Meaning V.G. Imp.
Very good improvement 75% - 100%
G. Imp.
Good improvement 50% - 75%
Imp.
Improved 25% - 50%
Asym.
Asymptomatic
Moved
Moved
Uncoop.
Uncooperative
Dist.
Distortion
The information reflected in the entries under "outcome" was obtained mainly through telephone calls by Dr. Labrenz to the patients. Asymptomatic means the patient was free of symptoms on the day he was contacted by Dr. Labrenz. Any recurrence of symptoms would not be reflected in the report. If a patient refused to make the number of visits recommended by Dr. Labrenz, he was listed as "uncooperative." Dr. Labrenz" evaluations of the results of the patients' treatment were not based on any scientific standards generally used in the profession. The evaluations *36 reflected mainly the information given Dr. Labrenz when he talked with the patients by telephone. The statistical data referred to above was incorporated in a report which contains a brief introductory statement describing the collected material as part of a research program. The report has not been published or otherwise disseminated to the public or to other members of the profession. Petitioner has never granted scholarships or loans to any students. Prior to 1968, Dr. Labrenz contributed roughly 10 percent of his income to religious or charitable organizations. After petitioner was created, he continued to contribute approximately 10 percent of his income to such organizations, and petitioner contributed about the same percentage of its income. ULTIMATE FINDING OF FACT Petitioner was not operated exclusively for any one or more of the exempt purposes enumerated in section 501(c) (3), and part of its net earnings inured to the benefit of an individual or individuals. OPINION To qualify for the exemption from income taxes under section 501(c) (3), [2] here claimed by petitioner, *37 it must be shown, among other things, that petitioner was "organized" and "operated" exclusively for one or more of the exempt purposes enumerated in that section and that no part of petitioner's net earnings inured to the benefit of a private individual. Petitioner has not made the requisite showing. Petitioner's certificate of incorporation, describing *38 the purposes for which it was organized, no doubt meets the technical organizational requirements of section 501(c) (3). However, the record shows quite conclusively, we think, that petitioner was not "operated" exclusively for any of the exempt purposes enumerated in the section. It was operated for profit as an ordinary business. Failure to meet the operational test alone is sufficient to disqualify it for the exemption. Sec. 1.501(c) (3)-1(a) and (c), Income Tax Regs.
Prior to petitioner's creation, Dr. Labrenz practiced as a self-employed chiropractor and received most of his income from professional fees. After petitioner was created, he continued to do the same kind of work for the same customary fees in the same location, drawing on the same sources for his patients.The operations of the foundation with Dr. Labrenz as its employee were not significantly different from the operations he performed as a private practitioner. The only difference was that he became petitioner's employee, and the fees he earned became petitioner's property from which he received a salary and other benefits. Pursuit of a professional practice is not one of the exempt purposes listed in section *39 501(c) (3). Petitioner contends that, within the meaning of section 501(c) (3), it was operated for "scientific" purposes: "to carry out a research program in the chiropractic field." In support of this contention, petitioner claims that the patients were merely objects of research and that they were charged fees only "to meet the expenses of operating the clinic." If this was a trade or business, petitioner maintains, it was "substantially related to the primary purpose of the Foundation and did not jeopordize [sic] its tax exempt status," citing Edward Orton, Jr., 56 T.C. 147 (1971). One difficulty with petitioner's argument is that the record does not show that petitioner ever actually engaged in any kind of research program. As far as the record shows, the foundation, through Dr. Labrenz, merely continued to provide chiropractic services. The board of directors, consisting of Dr. Labrenz, his wife, and the attorney who assisted in petitioner's organization, adopted a resolution describing a research program in general terms, but no such program was ever given vitality. Not one cent is shown to have been spent on scientific research as such. Although the *40 employment contract speaks in terms of Dr. Labrenz doing research, the practical fact is that he continued to provide his patients with the same Toftness method of chiropractic care, with some refinements, as he had provided since 1955, and he continued to maintain patient cards on which he recorded the same kind of data as he had previously recorded. The research performed by the foundation, Dr. Labrenz testified, consisted of comparing the results of his Toftness method treatments with "what we used to do" through the use of other methods of chiropractic treatment. Such other methods, he testified, caused 80 percent of the patients to recover fully or substantially, whereas his research showed that the Toftness method produced near 90 percent. [3] But Dr. Labrenz did not know what standards were employed in determining that 80 percent of the patients realized substantial improvement in their condition through the use of other methods. And even though he admitted remissions may occur, his report reflects only the information he received by telephone from his own patients on the state of their health on the dates he called them to inquire. The report contains no scientific analysis *41 or evaluation of the information so received. Nor does it contain any detailed description of the treatments administered or any suggestions of alternative courses of action that might have been followed. The report has never been published, and its contents have never been disseminated to anyone outside the foundation. Our study of the report and the testimony explaining it lead us to conclude that it does not show that petitioner was operated exclusively for scientific purposes. Dr. Labrenz testified that he provided care for charity patients, but, on cross-examination, he admitted that he never made it known to the public that he was desirous of taking charity patients and that his concept of a charity patient was one who failed to pay his bill. [4] Dr. Labrenz also testified that both he and petitioner gave 10 percent of their combined incomes to religious organizations, but he admitted on cross-examination that he had given 10 percent *42 of his income, consisting mainly of the fees received from his chiropractic work, to religious organizations prior to petitioner's creation. Petitioner's organizational minutes reflect a plan to provide scholarships or loans for deserving students, but Dr. Labrenz admitted that petitioner has never provided a scholarship for any student. Clearly, petitioner has not shown it was operated for charitable, religious, or educational purposes. Moreover, we are not satisfied that a part of petitioner's earnings did not inure to Dr. Labrenz or his benefit within the meaning of section 501(c) (3). In a very real sense, Dr. Labrenz used petitioner as a kind of "incorporated pocketbook." He drew on the foundation's funds, consisting mainly of *43 his fees, to cover the costs of his home, his automobile, most of the church contributions from his fees, care of his mother, and an additional sum designated as his salary. The employment contract between Dr. Labrenz and the foundation called for him to receive a salary of $3,600 per year. Yet he drew a "salary" of $3,172.60 for 9 months in 1968, $4,173.60 in 1969, and $4,398.60 in 1970. In addition, Dr. Labrenz" mother transferred to petitioner certain real property with a book value of $2,700 (petitioner claims, but offered no credible evidence to show, that, as recited in the annuity agreement, the property was more valuable) in exchange for a life annuity to be paid at the rate of $300 per month. Yet petitioner paid her larger sums, amounting to $7,780.38 in 1970, to cover her nursing home care and other expenses. These payments benefited her and discharged a family responsibility which otherwise would have been met from other resources. Thus, the inurement proscription of section 501(c) (3) was violated. See Scholarship Endowment Foundation v. Nicholas, 106 F.2d 552, 553 (C.A. 10, 1939), certiorari denied 308 U.S. 623 (1940).The case of Lewis v. United States, 189 F. Supp. 950 (D. Wyo. 1961), *44 relied upon by petitioner, is distinguishable on its facts. Petitioner answers that Dr. Labrenz" withdrawals cannot be said to be excessive as compensation for the services he performed. Cf. Mabee Petroleum Corp. v. United States, 203 F.2d 872 (C.A. 5, 1953). Since the foundation's income consisted mainly of the fees derived from his services, that may be true. Yet the employment contract which he signed with petitioner called for a salary less than his total withdrawals. The contract was never revised by any corporate action involving petitioner, and in making the additional withdrawals, Dr. Labrenz dealt both for himself and the foundation. The board of directors obviously provided no independent supervision. The unavoidable conclusion is that Dr. Labrenz and his family were free to make personal use of the corporate funds when, as, and if they chose to do so. The Founding Church of Scientology v. United States, 188 Ct. Cl. 490, 499, 412 F.2d 1197, 1202 (1969), certiorari denied 397 U.S. 1009 (1970); Birmingham Business College, Inc. v. Commissioner, 276 F.2d 476, 480-481 (C.A. 5, 1960). Moreover, except for the *45 payments supporting Adele and salaries paid to Dr. Labrenz, all expenditures by petitioner were of the same type and character as those incurred by Dr. Labrenz personally prior to petitioner's formation. Petitioner argues that respondent's withdrawal of the exemption ruling was arbitrary. The record does not show what representations were made to the Internal Revenue Service when the exemption ruling was obtained. However, for the reasons stated above, the certificate of incorporation, which was most assuredly part of the exemption ruling request, does not accurately describe petitioner's operations or the disposition of its income. We do not think the revocation of the ruling was an abuse of administrative discretion. Automobile Club v. Commissioner, 353 U.S. 180, 183-185 (1957); Kenner v. Commissioner, 318 F.2d 632, 636 (C.A. 7, 1963); Birmingham Business College, Inc. v. Commissioner, supra at 481. Decision will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted. ↩
2. SEC. 501.EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.
(c) List of Exempt Organizations. - The following organizations are referred to in subsection (a): * * * (3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office. ↩
3. Dr. Labrenz" report eliminates from his computation of percentages of recovery, numerous "uncooperative" patients. An "uncooperative" patient, according to his testimony, is one who declined to take the number of treatments recommended. ↩
4. Dr. Labrenz testified: Q. Well, how did you know they were charity people? A. If you don't get paid, that's charity. * * * Q. You mean they walked in off the street or were recommended to you and you billed them and they just didn't pay; is that correct? A. That happens. Q. And that's what you call a charity patient? A. Yes. ↩