**BIRMINGHAM BUSINESS COLLEGE, INC.; John Ike Griffith; Hulon A. Spears and Audrey Spears; Carl B. Carter and Jewell Carter, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 17937.

United States Court of Appeals Fifth Circuit.

April 4, 1960.

John Ike Griffith, Birmingham, Ala., for appellant.

Helen A. Buckley, Melva M. Graney, Lee A. Jackson, Dept. of Justice, Washington, D. C., Charles Owen Johnson, Sp. Atty., I.R.S., Herman T. Reiling, Acting Chief Counsel, I.R.S., Washington, D. C., Charles K. Rice, Asst. Atty. Gen., for appellee.

Before HUTCHESON, TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The principal question is whether Birmingham Business College (BBC) qualifies as a tax exempt entity under § 101(6), 26 U.S.C.A. § 101. The Tax Court held it was not. Related to that are subsidiary issues on the statute of limitations, computation of gross and net income, and the propriety of asserted penalties. Similar questions arise with respect to additional taxes and penalties imposed on the stockholder-owner-employees of BBC who are also petitioners here.

The Tax Court, after an extended trial on a lengthy record, held that BBC did

not satisfy two of the three statutory prerequisites that the institution (1) be organized and operated exclusively for educational purposes, and that (2) no part of the net earnings inure to the benefit of any individual or shareholder.[1]

Consideration of this took the Tax Court back through the life history of BBC. Quite properly the distillation process of the trial permits us to briefly summarize the facts upon which, we determine, the Tax Court was authorized to draw these conclusions.

About 1940 John Ike Griffith, one of the individual taxpayer petitioners, then employed as a principal of a small public school with a part time law practice, was assisting two others in the financing of the small business college in Birmingham bearing its present name. With increased financial difficulties, he ended up with the school on his hands. He persuaded his two sisters, Audrey and Jewell, to leave their teaching positions in the public school in Jackson County and come to Birmingham and run the school. He decided then to incorporate. He had heard that the federal taxing authorities had ruled that such an institution would be tax exempt if no salary exceeded $10,000. From his vantage as a school teacher, he could not conceive of ever paying himself more than $10,000. His objective was to obtain tax benefits of which he had vaguely heard. Consequently, he drew and filed the charter for an Alabama corporation. It called for a capital structure of $2,000 to be owned in equal one-third shares by him (at first through his mother who loaned him the money) and his two sisters, Audrey and Jewell. The charter [2] did declare the corporate purposes to be "operating a non-profit, eleemosynary institution of learning" with the incorporators "claiming * * * exemptions * * * from * * * taxation * * * under" Alabama law. But of decisive importance to Tax Court and us, the charter was to be a binding irrevocable perpetual contract "between the incorporators that they shall not pay themselves salaries except in * * * proportion to the amount of * * * stock held by each * * *."

For the years 1941–1945, no income tax returns whatever were filed. In 1946 Griffith as President filed application on the official form for income tax exemption. The information given was in many material respects completely er-

1. "Except as provided [elsewhere] the following organizations shall be exempt from taxation under this chapter—
   *     *     *     *     *
   "(6) Corporations * * * organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation. For loss of exemption under certain circumstances, see sections 3813 and 3814; * * *." 26 U.S. C.A. § 101 [§ 101, as amended, 1939 I.R.C.].

2. The charter recited among other things:
   "Know Ye, That the undersigned desire to become a body corporate for the purpose of operating a non-profit, eleemosynary institution of learning, known as the Birmingham Business College, to train students in the arts and skills of business training for the purpose of taking de-

serving boys and girls out of employment and raising their educational standards and securing them employment, and for other purposes, and the incorporators elect the privilege of claiming the exemptions allowed such institutions from exemption of taxation as provided under the laws of the State of Alabama. This document is to become and is also in the form of a contract between the incorporators that they shall not pay themselves salaries except in a manner of ratio and proportion to the amount of common or capitol [sic] stock held by each stockholder—and that two of the stockholders holding a majority of the stock can not get together and agree to vote themselves salaries out of proportion to the amount of common stock held by each stockholder and that this agreement is binding forever and is perpetual. That when a stockholder sells or otherwise disposes of his common or capitol [sic] stock he or she automatically forfeits his right under this contract in the ration [sic] and proportion to the amount of stock disposed of."

roneous, though no one has suggested that these three school teachers were consciously making representations known to be false with a purpose to defraud. This erroneous information covered such vital matters as the absence of capital stock, authority of the school to issue it, distribution of property or cash to stockholders, payments to stockholders for services rendered, the organization and the general statement that no part of the net income of the organization inured to the benefit of shareholders or individuals.[3] On July 16, 1946, the Commissioner granted the exemption "based upon the evidence presented" and stated that the school would "not be required to file returns of income unless you change the character of your organization, the purpose for which you were organized, or your method of operation."

Following the Revenue Agent's examination in 1952, which precipitated these taxes and penalties, the Commissioner on October 31, 1952, revoked the 1946 exemption ruling.

The Agent's examination revealed that BBC had few books or records. What there were had been loosely kept with glaring errors and omissions. It took a public accountant—a faculty member teaching accounting in the school—some 250 hours to reconstruct records for these eleven years. Covering much the same ground with an effort to verify subsidiary details, the Revenue Agent spent over 66 days in the same process. Both arrived at the conclusion that the school had had substantial income and net earnings, all of which, except for capital investments, had been distributed in one form or another to the stockholders, or to the husbands of Audrey and Jewell. Both Audrey and Jewell's husbands were, for most of this time, employed doing important work for the school.

It was these "drawings" by stockholders (or spouses) which caused so much difficulty in the determination of net earnings and its treatment by the Commissioner in the hands of the individual petitioners. Most of this was washed out by the Tax Court. But the details demonstrated a relationship similar to that existing between a commercial profit corporation and its shareholders. There was a constant commingling of the funds of the shareholders and BBC. On occasion receipts of BBC were deposited in the bank accounts of the individual shareholders without being recorded on BBC's books. Numerous personal expenses of the individuals were paid directly by BBC. The record reflects many instances where the shareholders treated the assets of BBC as their own to do with as they might desire. Money for cars they drove, for example, came from BBC. Again, this is not to suggest immoral or illegal conduct. Quite to the contrary, this represented a pooling of resources, but with a like expectation that what was there or what was left belonged equally to the three shareholder groups. For it is certainly clear that during many years the school had great difficulty in meeting its obligations for operating expenses. Frequently Griffith, Jewell and Audrey would borrow money pesonally to pay its obligations. Funds were inadequate to pay salaries or salaries adequate for services rendered. There was, without a doubt, a mutual sharing and sacrifice to keep the institution alive.

One incident treated as highly significant by the Commissioner and Tax Court was the use of some $17,000 by Audrey and her husband in the financing of the

3. The information was given in the form of answers to specific printed questions found on Form 1023 (revised July 1945), Treasury Department, Internal Revenue Service. For example, with respect to question 5, the answer stated that the organization was not authorized to issue capital stock, and that "It is a non-stock, closed, eleemosynary educational institu- tion * * *." Question 13(b) required that a separate statement be attached showing the amounts, if any, of payments made to members or shareholders for services rendered. No such statement was attached though, as this case shows, there were extensive payments for such services.

construction of their home. The Commissioner treated this as a dividend but the Tax Court concluded, properly we think, that it was a loan. But we agree that it is of substantial relevance for at least two reasons. First, it reflected the assumption that the shareholders were entitled to use the money available as might be needed. Second, a significant part of that sum was represented by a check paid by the Security Bank from BBC's account to Audrey. This was done under an express written direction [4] signed by Griffith as President certifying that it was "an advance payment against her one-third interest in the earnings of the college" and for which she would subsequently have to account to maintain the integrity of the one-third distribution called for in the charter, see note 2, supra.

■ We are, of course, required to look at this as it actually was, not as it might have been. So viewed, we agree with the Tax Court that in the way BBC was brought into being as a corporation and as it was operated, two things came about. First, it was operated as a business producing, or ultimately producing, substantial revenues for its operators. Second, the net earnings, or substantial portions, were to be, and were in fact, distributed to these shareholders for their own personal benefit.

■ Several things stand out. The school was established as a corporation under a form which sought carefully to preserve an equality among the stockholders. Consequently, while the payment of reasonable compensation, or even the anticipated expectation of such payment, does not constitute earnings inuring to the benefit of those who create a tax exempt organization, this corporation put an additional condition on such payments. Compensation was not merely to be limited to that which was reasonable for such services. It could under no circumstances exceed a ratable distribution based on stock ownership. It was, and was intended to be, a means by which to assure an equal distribution of the earnings.[5] It was treated this way throughout the continued operation of the school as the commingling of funds reflected, and as the certificate to the bank in 1950, see note 4, supra, so plainly attested. However reluctant we might be to reach this conclusion merely on the basis of the inartful corporate charter, note 2, supra, we have, with the Tax Court, undertaken to apply the tax law upon the practical operation which these taxpayers gave to the organization and their relation to it. In the current use of funds, in the use of available surplus cash, in the accumulation of capital investments available for distribution in the event of liquidation, what was left

4.                   "June 16, 1950
"To The Security Bank:
    "This is to certify that a personal loan of $4,300 is made to Audrey Spears of Birmingham Business College as an advance payment against her one-third interest in the earnings of the college, and to be strictly accounted for by her by audits of the books from time to tome [sic], showing that the stockholders each receive a like amount before she is relieved of this repayment.
             "Signed,
              ss/ John Ike Griffith
                  President"
Audrey Spears signed an appended receipt and acceptance.
5. In Gemological Institute of America v. Commissioner, 17 T.C. 1604, affirmed per curiam, 9 Cir., 1954, 212 F.2d 205, the corporation claiming exemption paid an individual a flat salary plus ½ of its net earnings as compensation. The Tax

Court held that the entire amount paid to the individual constituted reasonable compensation but this did not keep the payment of the percentage addition from being a distribution of net earnings. The Tax Court stated:
    "Regardless of what these amounts are called, salary of compensation based on earnings, it is obvious that half of the net earnings of petitioner inured to the benefit of an individual, viz., Shipley. These earnings are too material to be ignored. Roger L. Putnam, 6 T.C. 702. Cf. Edward Orton, Jr. Ceramic Foundation, 9 T.C. 533, affd. [6 Cir.] 173 F.2d 483. Such a distribution of net earnings is unequivocally prohibited by the statute. The petitioner has failed to meet one of the essential tests of section 101(6)."
See also Gemological Institute of America v. Ridell, D.C.S.D.Cal., 1957, 149 F.Supp. 128, 130.

over after deducting expenses was to be shared equally. Net earnings were, therefore, to be for the benefit of the three as shareholders. An essential ingredient for the statutory exemption was lacking.

■ The tax impact of this basic conclusion cannot be overcome by the further subsidiary contentions of BBC. No returns were ever filed. Consequently, the statute of limitations offers no protection.[6] The deficiency was, therefore, timely for tax years prior to July 16, 1946.

■ We think there is likewise no merit in the contention respecting years subsequent to 1946 on the ground that the Commissioner could not retroactively revoke the tax exemption ruling of July 16, 1946. The tax law, § 3791(b), provides that the Commissioner may prescribe the extent to which any ruling "shall be applied without retroactive effect." [7] This statute confirms the authority of the Commissioner under proper circumstances to correct a ruling retroactively. Cf. Automobile Club of Mich. v. Commissioner, 1957, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746. See also Standford University Book Store v. Helvering, 1936, 65 App.D.C. 364, 83 F. 2d 710. The Commissioner was certainly within his rights in considering that the exemption was erroneously granted because of material misrepresentation. The operations of BBC were not those shown by "the evidence presented" in the application and the operations were utterly different from those warranted.

■ When it comes to the computation of gross and net income, we find no basis for holding the Tax Court's action clearly erroneous. The disallowance of the $2,800 paid by BBC during 1942 to 1945 on the pre-1941 debts of the predecessor school was certainly proper. These were not ordinary and necessary expenses of BBC. The other small items including the $693.63 expended by BBC to repair the personal automobile of Griffith were also properly handled. The Tax Court differed considerably with the Commissioner's redetermination. All of such rulings were in favor of BBC to reduce its net income. The Tax Court allowed in full all of the sales expense even though the individual shareholders and their spouses could not even begin to account in detail. And, likewise contrary to the Commissioner's redetermination, the Tax Court held that all so-called drawings (other than items identifiable as sales expense) constituted compensation for personal services represented by the three shareholders and the two husbands. The Commissioner had treated these as informal dividends and disallowed both categories as deductions

---

**6.** "In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time." 26 U.S. C.A. § 276 (1939 I.R.C.). Quite obviously § 3813 (26 U.S.C.A.) of the 1939 Code and § 302 of the Revenue Act of 1950 (c. 994, 64 Stat. 906) 26 U.S.C.A. Int.Rev.Acts, page 145, are not relevant. The principal concern of this amendment was to unrelated business income of certain organizations tax exempt under § 101. No such problem is involved here. Here the exemption is denied, not because of unrelated business income, but because BBC did not meet the requirements of § 101 because its net earnings inured to the benefit of private shareholders or individuals. See Senate Finance Committee Report, S.Rep. No. 2375, 81st Cong., 2d Sess., p. 118 (1950–2 Cum.Bull. 483, 567), which states, inter alia, as follows. " * * * [s]ection 302 applies only where a denial of exemption might be made on the ground that the organization was carrying on a trade or business for profit, and nothing therein limits the denial of exemption for failure to meet other requirements of section 101."

**7.** § 3791(b) "Retroactivity of regulations or rulings—The Secretary, or the Commissioner with the approval of the Secretary, may prescibe the extent, if any, to which any ruling, regulation, or Treasury Decision, relating to the internal revenue laws, shall be applied without retroactive effect." 26 U.S.C.A. § 3791(b).

to the corporation. The Tax Court disagreed and gave BBC the full benefit of these deductions.

■ This brings us then to the taxes assessed against the individual petitioners. No real question is or can be made about the computation of the gross and net income subject to taxation as determined by the Tax Court. Here again its rulings were generally favorable to the Taxpayers. Where the Commissioner had disallowed sales expense made by the shareholders (and the two husbands) and had regarded such amounts as an informal dividend, the Tax Court found that these were reasonable in amount and had actually been incurred. This had a dual consequence. First, as we stated above, this permitted a deduction to the corporation in computing its net income. Second, for the individuals, this was a reimbursement for amounts actually expended and not income to them. It was eliminated entirely as a matter of income to the individuals. The Tax Court also allowed as a deduction to the corporation the full amount of the drawings by each of these individuals (other than as sales expense). This had no significance to the individuals as it was taxable income to them whether attributable to them as informal dividends, as found by the Commissioner, or as compensation as determined by the Tax Court. The Tax Court likewise ruled in favor of Audrey and her husband by treating the $17,447.92 advance as a loan, not a dividend. The Tax Court was correct in attributing to John Ike Griffith the professional income received by him in the years 1947–1950. It was earned and received. The fact that he turned the fees over to BBC does not make it any the less income to him. If, as impliedly suggested, these fees were donated to BBC, they failed to qualify as a charitable deduction by Griffith in view of the holding on the main issue on the nonexempt status of BBC.

■■ This leaves the matter of penalties. We think the Tax Court was justified in imposing on BBC the 25% penalty under 26 U.S.C.A. § 291(a) for failure to file returns. For the years 1941 to 1946 the absence of taxable net income did not excuse filing a return. As to subsequent years the exemption ruling ostensibly excused such filing. But since, as we have held above, the Commissioner was authorized retroactively to revoke it for misrepresentation of material facts, it ceased to exist. Without its operative effect BBC had no excuse for noncompliance with the statutory duty. As filing of the returns was required, it was also clear that any tax shown by such returns should have been paid. With respect to this the Tax Court was warranted in finding no sufficient excuse so that the 5% penalty under § 293(a), 26 U.S.C.A. § 293(a), likewise applied.

■ As to the individual Taxpayers, the negligence penalty of § 293(a) was warranted. The individuals were, as they well knew, receiving these funds from BBC. Part was for reimbursement of sales expenses as to which they were not required to pay the tax and for which no negligence penalty is now recovered. The remainder, used by them for personal living and similar expenses, whether characterized as an informal dividend, as did the Commissioner, or as reasonable compensation for personal services, as did the Tax Court, constitutes income knowingly received. It was not included and, apart from the confusion which permeated all of the financial records of the school and its stockholders, no showing was made why such income was not included. No sufficient showing was made by Jewell Carter for failure to file returns in 1945 and 1946 so imposition of the penalty under § 291 (a) was warranted.

Penalties under § 294(d) (1) (A) as well as § 294(d) (2), 26 U.S.C.A. § 294 (d) (1) (A), (2), were imposed as to John Ike Griffith, Hulon A. Spears and Audrey Spears, and the Carters. Subsequent to the decision of the Tax Court, the Supreme Court has disapproved our holding in Patchen v. Commissioner, 5 Cir., 1958, 258 F.2d 544, and has held

that the penalty under § 294(d) (2) may not be collected where the taxpayer has failed to file a declaration of estimated tax. Commissioner v. Acker, 1959, 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127.

As the amounts for taxes and penalties must be recomputed, the cause is remanded to the Tax Court for further consistent proceedings.

Affirmed in part, modified in part and remanded.