ROBERT A. PAULI AND CAROLYN D. PAULI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pauli v. Comm'r
Docket No. 19791-81.
United States Tax Court
T.C. Memo 1984-591; 1984 Tax Ct. Memo LEXIS 77; 49 T.C.M. (CCH) 42; T.C.M. (RIA) 84591; November 9, 1984. Lloyd Taylor,David A. Griffiths,Susan Lindteigen, and Gregory *77 G. Groh,[1] for the petitioners. Patricia Anne Golembieswki, for the respondent. PARKER MEMORANDUM FINDINGS OF FACT AND OPINION *78 PARKER, Judge: By statutory notice of deficiency dated April 22, 1981, respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1977 in the amount of $7,585. After a concession, [2] the issues for decision are (1) whether petitioners are entitled to a charitable contribution deduction in 1977 for amounts purportedly contributed to the Universal Life Church of Love of Redwood City a/k/a Family & Health Improvement Society of th *79 e Pacific (hereinafter sometimes referred to as the ULC-LRC or the "church"), [3] Charter No. 25078, a chapter of the Universal Life Church, Inc., of Modesto, California, and (2) whether petitioners are entitled to a charitable contribution deduction in the amount of $500 for amounts they allegedly contributed in 1977 to various organizations *80 other than the ULC-LRC. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The written stipulation of facts, as orally amended at trial, the oral supplemental stipulation of facts, and exhibits attached to the written stipulation of facts are incorporated herein by this reference. Petitioners Robert A. Pauli (Mr. Pauli) and Carolyn D. Pauli (Mrs. Pauli), husband and wife, resided at 1110 Deanna Drive, Menlo Park, California (the Menlo Park home) at the time they filed the petition in this case. During taxable year 1977, petitioner's legal residence was 3968 Lonesome Pine Road, Redwood City, California (the Redwood City home). They filed a joint *81 Federal income tax return (Form 1040) for their 1977 taxable year with the Internal Revenue Service Center in Fresno, California. As a child, Mr. Pauli attended a parochial grammar school and high school where, in addition to the required curriculum, he also received religious instruction in the Roman Catholic faith. In college Mr. Pauli took 8 semester hours of theology and 12 semester hours of philosophy. Mr. Pauli has degrees in engineering and business administration. Throughout 1977 and lasting into 1978, Mr. Pauli was employed full time as an executive with the Pauli & Griffin Company. At some point in 1978, Mr. Pauli left that job to become a full-time employee of another company. On their 1977 tax return (Form 1040), Mr. Pauli's occupation was listed as executive; Mrs. Pauli's as that of homemaker. On September 12, 1977, Mr. Pauli received credentials of ministry from the Universal Life Church, Inc., of Modesto, California (hereinafter sometimes referred to as Modesto or ULC), recognizing Mr. Pauli as an ordained minister of the Modesto organization. Mr. Pauli was not required to participate in any educational or religious training prior to his ordination, instead *82 receiving his minister's credentials upon payment of a $10 fee to Modesto as part of what Mr. Pauli described as a "mail order" procedure. Mr. Pauli subsequently received Charter No. 25078, dated October 7, 1977, from Modesto and on that date established his own congregation of the ULC named the Universal Life Church of Love of Redwood City (ULC-LRC). The address of the ULC-LRC was the same as that of petitioner's personal residence. Along with the Charter, Mr. Pauli also received a form copy of by-laws for his congregation. These by-laws were subsequently adopted by ULC-LRC without alteration or correction. See footnote 4 below. The by-laws were executed on behalf of the church by Mr. and Mrs. Pauli and a Mr. Jay M. Supkoff, a business associate of Mr. Pauli. The form by-laws supplied by Modesto called for a Board of Trustees (hereinafter the Board) to govern the activities, assets, and income of the congregation, and this structure was adopted by the ULC-LRC, with a provision for three board members. The Board, responsible for the financial affairs of the ULC-LRC, was composed of the following individuals: (1) Robert A. Pauli, President; (2) Carolyn D. Pauli, *83 Treasurer; and (3) Jay M. Supkoff, Secretary. The by-laws supplied by Modesto and adopted by the ULC-LRC also contained, inter alia, the following provisions: * * * Article VIII: Prohibition against sharing in Society Earnings No member, trustee, officer, or employee of or member of a committee of or person connected with the Society, or any other private individual shall receive at any time any of the revenue from the operations of the Society, provided, that this shall not prevent the payment to any such person of such reasonable compensation for services rendered to or for the Society in effecting any of its purposes as shall be fixed by the board of trustees; and no such person or persons shall be entitled to share in the distribution of any of the Society assets upon the dissolution of the Society. All members of the Society shall be deemed to have expressly consented and agreed that upon such dissolution or winding up of the affairs of the Society whether voluntary or involuntary, the assets of the Society after all debts have been satisfied, then remaining in the hands of the board of trustees shall be distributed, transferred conveyed, delivered, and paid *84 over, in such amounts as the Board of Trustees may determine or as may be determined by a court of competent jurisdiction upon application of the Board of Trustees, exclusively to charitable, religious, scientific, literary, or educational organizations which would then qualify under the provisions of Section 501 (c) (3) of the Internal Revenue Code and its Regulations as they now exist or as they may hereafter be amended. * * * Article X: Amendments 1. By trustees.The board of trustees shall have the power to make, alter, amend, and repeal the by-laws of the Society by affirmative vote of a majority of the board, provided, however, that the action is proposed at a regular or special meeting of the board and adopted at a subsequent regular meeting, except as otherwise provided by law. All by-laws made by the Board of Trustees may be altered, amended, or repealed by the members. 2.By members. The by-laws may be altered, amended, or repealed at any meeting of members of the Society by a majority vote of all the members, represented either in person or by proxy, provided that the proposed action is inserted in the notice of such meeting. *85 Article XI: Exempt Activities Notwithstanding any other provision of these bylaws, no member, trustee, officer, employee, or representative of this Society shall take any action or carry on any activity by or on behalf of the corporation not permitted to be taken or carried on by an organization not permitted to be taken or carried on by an organization [4] exempt under Section 501(c) (3) ot [sic] the Internal Revenue Code and its Regulations as they now exist or as they may hereafter be amended, or by an organization contributions to which are deductible under Section 170 (c)(2) of such Code and Regulations as hey now exist or as they may hereafter be amended. [Emphasis added.] * * * The ULC-LRC was not then and never has been incorporated. Shortly after formation of the ULC-LRC and before the end of 1977, a checking account, number XXXX-XX2352, was opened in ULC-LRC's name with the South San Francisco Industrial Office Branch of Wells Fargo Bank (hereinafter the church account). Mr. Pauli, Mrs. Pauli, and Mr. Supkoff each *86 had signatory authority over the church account, only one signature being required to draw checks thereon. Mr. and Mrs. Pauli also maintained a personal checking account in addition to the church account. On December 23, 1977, Mr. Pauli wrote a check on petitioners' personal checking account in the amount of $3,000, payable to the ULC-LRC, and deposited this check into the church account. Except for a service charge imposed in the amount of $6.39, the money deposited into the church account by Mr. Pauli during 1977 remained in the church bank account for the balance of that year. [5]
By a joint deed dated December 23, 1977, [6] Mr. and Mrs. Pauli, along with Alfred M. Pauli and Arline V. Pauli (Mr. Pauli's parents), each conveyed his/her respective 25 percent separate *87 but undivided interest in certain jointly owned real property located at 631 Spar Drive, Redwood City, California (hereinafter the Spar Drive property) to the ULC-LRC. A one-level, three-bedroom, two-bath single family dwelling complete with a two-car garage and fenced lawn was located on the Spar Drive property. The deed conveying the underlying real estate to the ULC-LRC specifically excepted from its operation and reserved to the grantors, their heirs and assigns ". . . any and all structures, improvements and fixtures thereon, and the full use, control and possession thereof, it being the specific intent of the grantors to convey to grantee title to the land only." Respondent has conceded for purposes of this case only that the fair market value of petitioners' combined 50 percent undivided interest in the land underlying the Spar Drive property was $17,200. After the land underlying the Spar Drive property was transferred to the ULC-LRC, the house and other improvements, including the personal property at 631 Spar Drive, were held as assets of a partnership *88 known as Robal One. [7] Robal One was owned by Mr. Pauli and his father, Alfred M. Pauli, who each had a 50-percent interest therein, respectively. Robal One rented out the entire Spar Drive property to an undisclosed tenant and thereafter remitted a portion of the rent to the church. The ULC-LRC received approximately $178 per month as ground rent from Robal One. *89 After its formation on or about October 7, 1977, the activities of the church for the remainder of that year were minimal, consisting solely of two meetings among alleged church members [8] which were held at petitioners' personal residence. The first meeting was held in October upon formation of the church and allegedly involved a discussion of religious and philosophical matters, as well as recruitment of new members into the church. The composition of the church's board was also allegedly established at this first meeting. The second meeting, held in December of 1977, allegedly involved a discussion of Christmas and its meaning in a "non-deistic church," and again recruitment of new members. Both these meetings involved social aspects and food and beverages were served to those attending. In 1978, the church held *90 a total of 13 meetings. Most, if not all, of these meetings were held in petitioners' personal residence. The overall format of these meetings did not significantly differ from those held in 1977. Mr. Pauli would speak on what he considered to be a philosophically or religiously oriented topic, and plans would be made for the next meeting. Social aspects were involved, and dinner and beverages were usually served to those in attendance. Other than these meetings, Mr. Pauli performed no sacerdotal functions of any type for the church in 1977 and 1978. Specifically, he performed no baptisms, funerals, or marriages [9] during either year. On April 1, 1978, Mr. Pauli received credentials of ministry from an organization known as the Family & Health Improvement Society (hereinafter FHIS), recognizing him as an ordained minister of that organization. As with the credentials of ministry received from Modesto, no educational or religious training of any type was required of Mr. Pauli, the credentials of ministry being granted to anyone who mailed in the appropriate fee. On the same day, Mr. Pauli also received a charter from FHIS in the name of the Family & Health Improvement *91 Society of the Pacific, to which petitioners thereafter changed the name of their church. The name on the church bank account was also changed to Family & Health Improvement Society of the Pacific. This change in name had no effect on the operations of the church and for convenience we will continue to refer to the church as the ULC-LRC. Petitioners did not thereafter dissociate themselves from the Modesto organization, instead choosing to remain affiliated with both Modesto and FHIS. [10] By letter dated March 10, 1978, petitioners had previously informed Modesto of their planned change in name and requested that Modesto issue them a revised charter under the new name. Petitioners subsequently received the revised charter with the new name, bearing the same number as the original and back-dated to the date petitioners' church was formed, October 7, 1977. Apparently, Modesto and FHIS were wholly separate and unrelated organizations, each selling mail-order credentials of ministry and charters for churches. *92 During their 1978 taxable year, petitioners made eight deposits totalling $59,000 of their personal funds into the church account.[11] An "operational summary" prepared by Mr. Supkoff [12] (hereinafter the summary), indicates that contributions totalling $6,975 were received from "others," resulting in total contributions received for 1978 in the amount of $65,975. Neither the summary nor anything else in the record indicates who these "other" contributors might be. In addition, the summary reports receipts for 1978 in the amounts of $1,447 and $402.18 as rental income and interest income, respectively. The total receipts of the church during 1978 equalled $67,824.18. *93 During 1978, checks totalling approximately $58,621 [13] and payable either to or on behalf of petitioners were drawn on the church account. [14] This total purportedly consisted of several categories of expenditures in the amounts shown below: Yearly Total Rounded
Nature of Expense
to Nearest Dollar
Pastor's salary
$ 3,900
Parsonage allowance
49,397
Automobile allowance
2,222
Meeting expenses
420
Reimbursement to Robert Pauli
2,682
Total:
$58,621
*94 The pastor's salary consisted of a $300 monthly payment which purportedly represented compensation for Mr. Pauli's duties as minister of the ULC-LRC. Petitioners reported $3,600 of this amount as gross income on their 1978 tax return. [15]
The auto allowance consisted of a monthly allowance of $202 paid to petitioners. However, only 11 such payments were made during 1978. The record does not disclose exactly what these payments were ultimately used for by petitioners, but we presume they were used for automobile expenses. Petitioners received various amounts each month which purportedly constituted a parsonage allowance. Amounts reported in the summary as parsonage allowances included payments for utility bills attributable to petitioners' personal residence. The church paid some of these utility bills directly; others were paid first *95 by petitioners, who were then reimbursed by the church. In addition, petitioners received a monthly lump-sum payment which was labelled as a parsonage allowance. The amount of the lump-sum payment varied over the course of the year, remaining stable at one fixed amount for several months, then changing to a different amount in other months. Prior to July of 1978, the amounts received by petitioners as a parsonage allowance related to their occupancy of the Redwood City home. In approximately June or July of 1978, petitioners purchased the Menlo Park home. The downpayment on the Menlo Park home, totalling $22,278, was paid by two checks drawn on the church account in the amounts of $8,000 and $14,278 and dated May 19, 1978 and May 24, 1978, respectively. Title to the Menlo Park home was taken in petitioners' names. Shortly after the purchase thereof, petitioners moved into the Menlo Park home. The street address of the church was then also changed to that of the Menlo Park home. In addition to the $22,278 withdrawn from the church account and used to make the downpayment on the Menlo Park home, petitioners continued to receive monthly checks drawn on the church account in varying *96 amounts, purportedly representing the remainder of petitioners' parsonage allowance for 1978. After the purchase of the Menlo Park home, the amount of the monthly parsonage allowance roughly corresponded to the amount of the mortgage payment and interest thereon, plus all of the insurance, utilities and miscellaneous expenses related to use of the Menlo Park home as petitioners' personal residence. During 1978, three checks totalling $3,543.09 were drawn on the church account and used to buy furniture for use in petitioners' personal residence. The summary lists these expenditures as part of the parsonage allowance paid to Mr. Pauli for 1978. Two of the checks, payable to "Designs for Living" and totalling $2,006.09, represent payments for furniture originally used at the Redwood City residence and then subsequently moved and used at the Menlo Park home. The other check, in the amount of $1,537 and payable to "Audrey M. Borland Studios," represents payments for new furniture purchased specifically for use in the Menlo Park home. The furniture purchased from Designs for Living allegedly consisted of office-type furniture designed for use in the home. No information *97 on the type of furniture purchased from the Audrey M. Borland Studios was offered. During 1978, petitioners also received numerous checks in various amounts drawn on the church account and payable to either Mr. or Mrs. Pauli. These checks normally bore a notation that they represented "reimbursement-expenses" or simply "expenses." The summary reports that the total of such payments made to petitioners during 1978 was approximately $3,102. A portion of the "expenses" allegedly reimbursedby such checks represented the cost of food and beverages served by petitioners to those attending the monthly church meetings held at their personal residence. Part of these expenses may also represent reimbursement to petitioners for their payment of the utility bills related to their personal residence. No evidence as to the nature of the remainder of the expenses allegedly sought to be reimbursed by these checks was offered at trial. Mr. Pauli claimed that all of these expenses were paid upon the submission of vouchers to the church which summarized and also documented such expenses, but no such vouchers were produced during discovery or introduced into evidence at trial. No books *98 and records detailing such expenses were introduced, nor was Mr. Pauli aware of whether such books and records actually existed. Petitioners had two minor children during 1977 and 1978, named Laura and David. During 1978, both Laura and David attended the St. Joseph School, a part of the Sacred Heart School. Laura was an eighth grade student; the record does not reveal which grade David was in. During 1978, two checks payable to the Sacred Heart School in the respective amounts of $100 and $1,975 were drawn on the church account. The $1,975 check represents tuition for petitioners' two children at the St. Joseph School. Mr. Pauli did not know whether the $100 check also represented tuition for his children or was instead a donation to the school. In connection with asummer school program, during the summer of 1978 Laura Pauli attended a foreign language school held in France. The cost of this trip was paid for by several checks drawn on the church account and payable to the American Institute for Foreign Studies, such checks totalling $1,456. On the same day as the last of the checks issued in payment for Laura's attendance at the foreign language school, a check *99 in the amount of $225.93 and payable to "New West Travel" was also drawn on the church account. Mr. Pauli did not know whether this check was used to pay Laura's travel expenses to France. In addition to petitioners' children, several checks were drawn on the church account during 1978 and used to pay the tuition costs of other purported church members or their children. The total of such checks was at least $1,936. All of the checks drawn on the church account during 1978 and used to pay the tuition of petitioners' children and of other purported members and their children, and also Laura's participation in the summer school program in France were listed as scholarship payments on the summary. The summary reports a total amount of $5,981.58 as scholarship payments during 1978. During 1978, other checks were also drawn on the church account, payable to the following organizations or individuals in the following amounts: Payee
Amount
American Youth Soccer Organization
$ 250
Hillsborough Benevolent Society
1,000
Peninsula Children's Center
Charter Auxiliary  1,000
Marriage Encounter
500
San Mateo Little League
300
YMCA
300
Father Fitzsimon
100
Total:
$3,450
*100 Some of these organizations were involved in charitable or public activities, others were not. The $100 payment to Father Fitzsimon was made because he was a retiring priest whom petitioners wanted to "help out." [16]
A check in the amount of $125 was also drawn on the church account in 1978 and used to purchase some shares of stock, title to which was taken in the church's name. This stock was subsequently sold by the church at a profit. The *101 record does not disclose either the amount of the gain on the sale or the date thereof, but it appears that such sale occurred subsequent to the end of 1978. All of the checks drawn on the church account were allegedly authorized by the church's Board which, as noted, consisted of petitioners and Mr. Supkoff during 1978. No such resolutions nor any minutes of such board meetings alleged to exist were produced in response to the Court's discovery order or introduced into evidence at trial.[17] Such resolutions allegedly required the affirmative vote of 2 of the 3 Board members for passage. As petitioners constituted the requisite two-thirds majority needed to pass a resolution, petitioners could control the fiscal policy of and expenditures by the church, and Mr. Pauli admitted as much at trial. *102 During 1977, petitioners also claimed to have donated an additional $500 to various organizations other than the ULC-LRC, as follows: Donee
Amount
United Fund
$ 20
Mt. Alverna Convent
35
St. Vincent
179
Good Will
155
Not Specified
111
Total:
$500 The donations allegedly consisted of both cash and personal property belonging to petitioners. No documentary evidence establishing that any of these claimed donations was in fact made during petitioners' 1977 taxable year was presented at trial, [18] the only evidence in this regard consisting of Mr. Pauli's self-serving, unsupported oral testimony. On their joint Federal income tax return (Form 1040) filed for their 1977 taxable year, petitioners *103 reported a combined gross income in the amount of $47,056. They also claimed a charitable contributions deduction under section 170 in the amount of $20,700 for cash contributions. The $20,700 actually consisted of the $3,000 cash and the Spar Drive property allegedly contributed to the ULC-LRC in 1977, plus the $500 miscellaneous contributions to various other organizations claimed to have been made in that year. In his statutory notice of deficiency, respondent disallowed the claimed deductions in full. OPINION I. Alleged Contributionsto the ULC-LRC
Section 170(a) [19] allows as a deduction any charitable contribution that is made during the taxable year. The term "charitable contribution" is defined in section 170(c) as follows: (c) Charitable Contribution Defined.--For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of-- * * * (2) A corporation, trust, or community chest, fund, or foundation-- (A) * * * (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, * * *; (C) no part of the net earnings of which inures to the benefit *104 of any private shareholder or individual; * * * Deductions are a matter of legislative grace, and taxpayers must satisfy the specific requirements of the deductions they claim. Deputy v. du Pont,308 U.S. 488 (1940); New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934).Taxpayers bear the burden of proving their entitlement to the deductions they claim. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. These rules apply with equal force to deductions claimed for charitable contributions. Davis v. Commissioner,81 T.C. 806, 815 (1983) (on appeal 9th Cir. June 25, 1984). We must first point out that petitioners' position that contributions made to the ULC-LRC are deductible under section 170 can derive no support from the fact that the Modesto organization enjoyed tax-exempt status under section 501(c)(3) during 1977.[20] This Court has previously recognized in numerous cases that the exemption granted *105 to Modesto was not a group exemption, and that a "charter" organization or chapter such as the ULC-LRC involved herein does not come within the specific exemption held by Modesto. Davis v. Commissioner,supra,81 T.C. at 815.[21] Whether labeled as "charters," "congregations," or some other term, the various groups receiving charters from the Modesto organization are separate and distinct from that organization and are not entitled to the benefit of Modesto's tax-exempt status. Petitioners do not place a great deal of reliance on the tax-exempt status of the Modesto organization during 1977, mentioning such fact only in passing in their briefs. Instead, most of petitioners' arguments are addressedto whether the ULC-LRC itself has satisfied the numerous requirements of section 170(c) and is therefore a *106 qualified recipient of deductible charitable contributions. An examination of the facts in this case leads inescapably to the conclusion that the ULC-LRC does not satisfy those requirements. In order to carry their burden of proving that contributions to the ULC-LRC are deductible under section 170, petitioners must demonstrate, among other things, that no part of the church's net earnings (which include the contributions made to the church) inured to their private benefit, or to the private benefit of other individuals. Sec. 170(c)(2)(C). They simply have not done so. As our findings of fact indicate, during 1978 checks payable to or on petitioners' behalf and totalling approximately $58,621 were drawn on the church account, $49,396 of which purportedly represented a "parsonage allowance." Such funds were used to pay all expenses, including mortgage payments, insurance, maintenance, and utilities, arising from the personal residence of petitioners and their two children, first with respect to the Redwood City home and then with respect to the Menlo Park home. Money withdrawn from the church account in the amount of $22,278 was used to make the downpayment on the Menlo Park *107 home, title to which was taken in petitioners' names. All subsequent mortgage and interest payments thereon were also made from the church account. Checks drawn on the church account totalling $3,543.09 were also used to purchase furniture for use in the Redwood City and Menlo Park residences. Numerous checks were drawn on the church account and issued to petitioners, allegedly for reimbursement of expenses incurred by petitioners in church related activities. These checks totalled some $3,102. A portion of these expenses represented the cost of dinners and beverages served to those attending the church's monthly meetings. Most of these expenses remain wholly unexplained by petitioners, although vouchers allegedly exist which allegedly detail and document such expenses. Extensive discovery was conducted in this case, and no such documents were ever found or produced. In addition, during 1978 checks totalling approximately $3,531 were drawn on the church account and used to pay the tuition for petitioners' two children at a parochial school, as well as the costs of their daughter's trip to a language school in France as part of a summer school program. Various *108 amounts were also withdrawn from the church account and used to pay the educational costs of other alleged church members and their children. All of these amounts are alleged to constitute scholarships given by the church. Petitioners presented no evidence to support this claim other than Mr. Pauli's self-serving, uncorroborated, and wholly unconvincing testimony. Petitioners' argument that such expenditures represent valid church expenses must fail. Expenditures of the type in question here would normally be considered personal, family living expenses, and we are unpersuaded by petitioners' attempt to transform them into valid church expenditures. See Davis v. Commissioner,supra,81 T.C. at 818. In reaching this conclusion, we find it significant that petitioners' personal residence also purported to serve as the church's location. Also the bulk of the church expenditures related to purchasing, furnishing, maintaining, and paying the mortgage on the house owned and occupied by petitioners and their children. We are also impressed by the fact that petitioners' alleged contribution in 1978 of $59,000 greatly exceeded their total reported gross *109 income of $47,056 for 1977. While petitioners did not favor the Court with any evidence as to their total gross income for 1978, there is nothing to suggest that it was so significantly greater than in 1977. Petitioners have alluded to no nontaxable source of money which could be used to provide for their personal living expenses in 1978. Under these circumstances, we think a clear inference arises that most if not all of Mr. Pauli's 1978 salary was deposited in the church account and the checks drawn on the church account were used to pay a large part of petitioners' personal and family living expenses for that year. Petitioners next assert that only the $178 monthly rental income from the Spar Drive property should be considered as "earnings" of the church. From this they apparently argue that since the amount of such rental income was less than the amounts allegedly donated by the church to various organizations in 1978, there were no "net earnings of the church left to inure to anyone's benefit." Petitioners also emphasize their claim that the total amount of the payments they received in 1978 was less than their alleged contribution in that year of $59,000. *110 Petitioners have misconstrued the meaning of the term "net earnings" for section 170(c)(2)(C) purposes. It is settled that "net earnings" include more than net profits (and in the case of a church includes the contributions thereto) and may inure to the benefit of a private person other than by distribution of dividends. Canada v. Commissioner,82 T.C. 973, 981 (1984), and cases cited therein. Furthermore, petitioners' argument that the amount of any earnings that inured to their benefit was less than their contributions to the church, even if it were true, [22] is inapposite. Section 170(c)(2)(C) expressly provides that "no part" of the net earnings may inure to petitioners' benefit. Even if the benefit inuring to an individual is small, it is still impermissible. McGahen v. Commissioner,76 T.C. 468, 482 (1981), affd. without published opinion 720 F. 2d 664 (3d Cir. 1983); Unitary Mission Church v. Commissioner,74 T.C. 507 (1980), affd. without published opinion 647 F. 2d 163 (2d Cir. 1981). [23]
*111 Petitioners' argument that the benefits received constitute no more than a parsonage allowance permitted by section 107 must also fail. Section 107, in pertinent part, provides that: In the case of a minister of the gospel, gross income does not include-- (1) the rental value of a home furnished to him as part of his compensation; or (2) the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home. To the extent that the payments made to petitioners actually represented reasonable compensation for Mr. Pauli's performance of services of a type ordinarily performed by a minister of the gospel, such payments would not constitute prohibited inurement under section 170(c)(2)(C). Cf. Bubbling Well Church v. Commissioner,74 T.C. 531, 537 (1980), affd. 670 F. 2d 104 (9th Cir. 1981); Birmingham Business College, Inc. v. Commissioner,276 F. 2d 476, 480-481 (5th Cir. 1960), affg. on this issue a Memorandum Opinion of this Court. However, excessive payments purportedly representing such compensation do constitute inurement in violation of section 170(c)(2)(C). Cf. *112 Bubbling Well Church v. Commissioner,supra,74 T.C. at 537; Mabee Petroleum Corp. v. United States,203 F. 2d 872, 876 (5th Cir. 1953); Gemological Institute of America v. Commissioner,17 T.C. 1604, 1609 (1952), affd. per curiam 212 F. 2d 205 (9th Cir. 1954). Whether compensation payments are reasonable in amount is purely a question of fact to be resolved in the light of all of the evidence. Bubbling Well Church v. Commissioner,supra,74 T.C. at 537-538 and cases cited therein. Even assuming that the payments designated as "parsonage allowances" were intended as remuneration for any duties performed by Mr. Pauli of a type ordinarily performed by a minister of the gospel, a matter as to which we remain wholly unconvinced, it is clear that the amount of such payments greatly exceeded that which under any stretch of the imagination could be considered reasonable compensation under the facts in this case. Mr. Pauli was employed full time as an executive of a company. So far as the record shows, the only church services of any type performed by Mr. Pauli during 1977 and 1978 consisted *113 of the approximately 15 "meetings" held mostly at petitioners' residence during those years. These meetings appear to have been loosely structured social functions including dinners and drinks, and apparently requiring little preparation by Mr. Pauli in the way of study or research. No marriages, baptisms, or funerals were performed in either year. [24] For these minimal services, amounts designated as a parsonage allowance and totalling $49,397 were paid to petitioners, in addition to Mr. Pauli's salary of $3,600 and auto allowance of $2,222. This far exceeded his 1977 salary as a full-time executive of a company. We think it incontrovertible that such an amount exceeded a reasonable compensation for any ministerial services actually performed by Mr. Pauli, and therefore constituted inurement prohibited by section 170(c)(2)(C). Furthermore, even if the amount paid to petitioner ostensibly as a "parsonage allowance" could somehow be considered as reasonable compensation, other payments were made *114 to or for petitioners' benefit that would support a finding of prohibited inurement. Petitioners received payments approximating $3,102 which allegedly represented reimbursement for church related expenses. Petitioners presented do documentary evidence concerning such payments, although such documentation was alleged to exist, nor did Mr. Pauli's testimony at trial identify or explain the nature of such purported expenses. In addition, funds from the church account were used to pay the tuition for petitioners' two children at the parochial school they attended, as well as the costs associated with their daughter's trip to France as part of a summer school program. We are not persuaded by petitioners' arguments that such payments were merely a part of a scholarship program conducted by the church. We note that the "scholarship" payments on behalf of petitioners' children greatly exceeded those payments designated as scholarships and made to other alleged members of the church and their children. The presence of such payments provides an independent basis for concluding that the ULC-LRC has not passed the private inurement test of section 170(c)(2)(C). Our conclusion herein that *115 the church's "net earnings" inured to petitioners' private benefit in violation of section 170(c)(2)(C) also leads to the conclusion that the church has failed the "operational" test of section 170(c)(2)(B). While they constitute separate requirements, the "private inurement" test and the "operated exclusively" for exempt purposes test prescribed by sections 170(c)(2)(C) and (B), respectively, often substantially overlap, in the sense that operating for an exempt purpose necessitates providing a public, and not a private benefit. See Unitary Mission Church v. Commissioner,supra,74 T.C. at 512, n. 7. An organization is operated "exclusively" for exempt purposes if its activities primarily serve one or more exempt purposes and not, except to an insubstantial degree, a nonexempt purpose. Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.[25] An organization is not operated exclusively for an exempt purpose if it serves a private rather than a public interest. Canada v. Commissioner,supra,82 T.C. at 981 and cases cited thereat; see also sec. 1.501(c)(3)-1(d)(1), Income Tax Regs. An organization is not operated exclusively for an exempt *116 purpose if its net earnings, in whole or in part, inure to the benefit of a private individual. See B. H. W. Anesthesia Foundation v. Commissioner,72 T.C. 681, 684, n. 3 (1979); Lowry Hospital Association v. Commissioner,66 T.C. 850, 857, n. 8 (1976). See also sec. 1.501(c)(3)-1(c)(2), Income Tax Regs. Although the form by-laws adopted bythe ULC-LRCcontained a provision purportedly prohibiting its members from engaging in activities proscribed by section 170(c)(2)(C), it is clear from the record that such prohibitions were not obeyed, and Mr. Pauli did engage in such proscribed activities. Thus, the extensive private inurement in this case clearly precludes the ULC-LRC from satisfying the "operational" test of section 170(c)(2)(B), and provides additional support for our conclusion that the ULC-LRC was not a qualified recipient of deductible charitable contributions. [26]
*117 Before concluding our discussion of whether or not amounts transferred to the ULC-LRC qualify for the charitable contributions deduction under section 170, there are several other issues raised by petitioners that we will address. Petitioners assert that this Court cannot consider facts and events occurring in 1978 in determining whether their transfers occurring in 1977 are deductible in that year under section 170. Petitioners are mistaken, confused, or both. It is true that we cannot redetermine petitioners' tax liability for any year other than that in issue. Cf. sec. 6214(b). However, we clearly may consider events occurring in other years to the extent they are relevant in determining petitioners' true tax liability for the year(s) before the Court, any contention to the contrary deserving no further discussion. That is all that we have done herein. Indeed, such facts are extremely relevant in a case such as this where petitioners' organization was not even formed until the latter part of the taxable year for which the deductions were claimed. Furthermore, we find petitioners' argument on this point highly incongruous and rather disingenuous, since petitioners' *118 claim that the ULC-LRC independently meets the requirements of section 170(c) relies heavily on the events that transpired in 1978, and necessarily so. But for those 1978 events that the parties have argued and the Court has considered at length, we would have easily found and stated in far fewer words that petitioners had utterly and completely failed to carry their burden of proof. The First Amendment claims raised by petitioners must also fail. The provisions of section 170(c) in no way interfere with petitioners' right to the free exercise of religion.Their alleged religious activities are not being taxed. The free exercise clause does not require the Government to subsidize such activities. See Church of Scientology of California v. Commissioner,83 T.C. 381, 458, slip op. at 117 and cases cited thereat (filed Sept. 24, 1984); Graham v. Commissioner, 83 T.C.    , slip op. at 10-11 (filed October 15, 1984). Nor do the provisions of section 170(c) violate the establishment clause of theFirst Amendment. See Church of Scientology of California v. Commissioner,supra,83 T.C. 460-464, slip op. at 120-127 and cases cited *119 therein; Graham v. Commissioner,supra, 83 T.C.    , slip op. at 11-13. Petitioners also assert that a holding that the "parsonage allowances" received by them constitute inurement prohibited by section 170(c)(2)(C) would result in a denial of equal protection, [27] since a minister of an "established" church may receive such amounts without affecting the deductibility of contributions to this church. Petitioners' claim is without merit. The provisions of sections 107 and 170(c) apply with equal force to both "established" and more recently-formed churches, and therefore do not violate equal protection on their face. Nor have petitioners demonstrated that respondent's application of those provisions violates equal protection. They have not called our attention to any instance where an "established" church, under a set of facts such as is present in this case, has been treated by respondent as an eligible recipient of deductible contributions under section 170(c). Here petitioners have simply run large portions of their personal family expenses through their church account in the guise of a purported "parsonage allowance." *120 Also erroneous is petitioners' claim that this Court lacks jurisdiction to determine whether the ULC-LRC is a church within the legal meaning of that term. Cf. Chapman v. Commissioner,48 T.C. 358 (1967). We stress, however, that we have not addressed this issue herein, nor need we address the sincerity of petitioners' beliefs. Even assuming the ULC-LRC was legally a "church" and that its purposes and activities were religious in nature, matters on which we express no opinion, there are other factors present in this case that preclude it from qualifying as an eligible recipient of deductible charitable contributions under section 170(c)(2). Finally, petitioners rely on Oppewal v. Commissioner,468 F. 2d 1000 (1st Cir. 1972), DeJong v. Commissioner,309 F. 2d 373 (9th Cir. 1962), and Rev. Rul. 76-185, 1976-1 C.B. 60, for the proposition that even if part of the contributions to the ULC-LRC were used for nonexempt purposes, the balance of such contributions would still be deductible. Petitioners' reliance is misplaced. In both cases and in the revenue ruling, the respective donee-organization involved *121 met the requirements for an eligible recipient of deductible charitable contributions under section 170(c)(2). The issue instead was what portion of a payment to an admittedly qualified organization constituted a "charitable contribution" within the meaning of section 170(c) and what portion constituted payment for tuition or other financial or economic benefits the payor received or expected to receive from the donee-organization. Petitioners' case is readily distinguishable on its facts. Petitioners having failed to demonstrate that the ULC-LRC met the "private inurement" test and "operational" test of section 170(c)(2), the church was not an eligible recipient for deductible charitable contributions. Accordingly, respondent's disallowance of the deductions claimed by petitioners for alleged contributions thereto must be sustained. II. Alleged Contributions to Miscellaneous Organizations
Petitioners also claimed an aggregate of $500 on their 1977 tax return for alleged cash contributions to numerous organizations. Petitioners presented no documentary evidence establishing that such contributions were in fact made or, if so, who the recipients of such contributions *122 were. The only evidence offered in support of these contributions was Mr. Pauli's unsupported and self-serving testimony, to which we attach little weight. We note that even that scant testimony dealt with only $389 of the total $500 claimed as a deduction. Petitioners have not carried their burden of proof on this item. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Respondent's disallowance thereof is sustained. [28]
*123 To reflect the foregoing and respondent's concession on the partnership loss, Decision will be entered under Rule 155.
Footnotes
1. On April 2, 1982, this Court granted David A. Griffith's motion to withdraw as counsel. On September 27, 1983, this Court granted petitioners' motion to withdraw as counsel all persons other than Lloyd Taylor.↩
2. In the statutory notice of deficiency, respondent disallowed in toto petitioners' claimed distributive share of partnership losses for taxable year 1977 from a partnership known as "Robal One." Respondent has now conceded this adjustment. ↩
3. Our use of the word "church" to refer to petitioners' organization is for convenience only and is in no way intended to express any conclusion on our part as to whether petitioners' organization does, in fact, constitute a church or religious organization.↩
4. The duplicated language ("not permitted to be taken or carried on by an organization") appears in the form by-laws supplied by Modesto.↩
5. Although there were two checks drawn on the church account during 1977--one dated December 28, 1977 in the amount of $680.92; the other dated December 29, 1977 in the amount of $300--both of which were payable to Mr. Pauli, respondent has apparently accepted petitioners' claim that such checks were not actually received and presented for payment until after the close of petitioners' 1977 taxable year.↩
6. This deed was recorded with the San Mateo County, California Recorder's Office on December 27, 1977.↩
7. The balance sheet attached to Robal One's 1977 partnership return (Form 1065) also lists land with a value of $34,400 as an asset of the partnership, such land being that underlying the Spar Drive property.On Mr. Pauli's Schedule K-1 from Robal One for 1977, an amount of $17,200 is shown as Mr. Pauli's distributive share of the partnership's charitable contributions for the year. This is also attributable to the land underlying the Spar Drive property. From this, respondent apparently questions whether the Spar Drive property was transferred to the ULC-LRC by the partnership or by petitioners individually. Petitioners contend that the inclusion of the land as a partnership asset, and derivatively upon Mr. Pauli's Schedule K-1, resulted from an error of the partnership's accountant. In view of our disposition of this case, we need not resolve this matter. We assume for purposes of our opinion that petitioners themselves transferred the land to ULC-LRC.↩
8. Mr. Pauli claimed the church had 10 members in 1977, and increased its membership to 16 in 1978, 21 in 1979, and 27 in 1980, respectively. None of these alleged members appeared as witnesses at trial, nor was there any other evidence that such members existed other than Mr. Pauli's self-serving, uncorroborated, and wholly unpersuasive testimony.↩
9. Two marriages were apparently performed by Mr. Pauli in 1980.↩
10. Petitioners remained affiliated with FHIS until sometime in 1981, when that organization apparently became defunct.↩
11. Petitioners also assert that they claimed no charitable contributions deductions for any portion of this amount. However, petitioners did not introduce their 1978 tax return into evidence and offer nothing in support of this assertion but Mr. Pauli's own self-serving and wholly uncorroborated testimony. ↩
12. Mr. Supkoff was an accountant with Financial Concepts. He kept the church's books and records, for which his employer was paid a total of $300 in 1978. No original books and records were presented during discovery or at trial to corroborate the figures used by Mr. Supkoff to prepare the summary of the church's income and expenses for 1978, but petitioners did not dispute the accuracy of that summary.↩
13. Adjusted to reflect Mr. Pauli's testimony that two checks drawn on the church account and dated December 28, 1977 and December 29, 1977, respectively, were not actually received by petitioners until sometime in the early part of 1978. See footnote 5, supra.↩
14. Most of these checks were signed solely by Mr. Supkoff. We find this somewhat odd since Mrs. Pauli was supposedly the Treasurer of the ULC-LRC and as such would ordinarily be expected to sign such checks rather than the Secretary, Mr. Supkoff. This practice may merely have been a reflection of the fact Mr. Supkoff was keeping the church's books and records; it could also represent an awareness by petitioners that the presence of Mrs. Pauli's signature on such checks could be an adverse factor if the deductibility of contributions to the church was later questioned by respondent. Petitioners have offered no explanation of this ambiguity.↩
15. Petitioners apparently did not report the $300 salary payment attributable to the month of December 1977 as gross income for their 1978 taxable year. Nor did petitioners report the amount on their 1977 joint return.However, respondent has not raised any issue as to unreported income and we do not address it further herein.↩
16. In addition to the monetary contributions made to the above organizations, the church also allegedly sponsored a furniture drive in 1978 and collected a small amount of furniture which was then given to an organization named Penisula Volunteer, allegedly for use at a home for indigent and financially disadvantaged senior citizens operated by that organization. However, in view of the nature of the items collected--several old lampshades, several small paintings, some old clothes and assorted odds and ends--we think it at least as likely that the furniture that allegedly resulted from the church's furniture drive in actuality represented no more than the product of a bit of "spring cleaning" of petitioners' personal residence.↩
17. We point out that attached to petitioners' reply brief were several photostatic copies of documents purporting to represent minutes of church meetings. These documents were discussed at trial but neither party offered them into evidence.Ex parte affidavits and statements in briefs do not constitute evidence and will not be considered by the Court. Rule 143(b), Tax Court Rules of Practice and Procedure; Evans v. Commissioner,48 T.C. 704, 709 (1967), affd. per curiam 413 F. 2d 1047 (9th Cir. 1969); West 80th Street Garage Co. v. Commissioner,12 BTA 798 (1928). See Perkins v. Commissioner,40 T.C. 330, 340↩ (1963).Furthermore, even if these documents had been timely and properly introduced into evidence, they provide at best only minimal support for petitioners' position. These documents do not constitute resolutions or minutes of board meetings and even as minutes of church meetings, they are sketchy and essentially uninformative.
18. At trial, Mr. Pauli had in his possession a yellow legal pad which allegedly represented the only record of petitioners' contributions during 1977. This document was not offered into evidence by petitioners. Even if the documents had been offered by petitioners, it was not dated, there was no indication that it had been prepared contemporaneously with the donations it supposedly documented, and it contained errors on the face of the document.↩
19. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
20. We note that the Internal Revenue Service has recently withdrawn its recognition of the tax-exempt status of the Universal Life Church, Inc., of Modesto, California. See Internal Revenue Service News Release, SF 84-32, dated August 28, 1984.↩
21. See Rose v. Commissioner,T.C. Memo. 1984-537↩, n. 19 and cases cited therein.
22. The payments made directly to or on behalf of petitioners, plus the payments made on their behalf for their children's tuition, equal or slightly exceed the amount petitioners allegedly contributed to the church in 1978, plus the $3,000 cash contributed in 1977.↩
23. See also Rose v. Commissioner,supra.↩
24. Although two marriages were apparently performed in later years, this fact can have no effect on the reasonableness of Mr. Pauli's compensation in earlier years.↩
25. The regulations under section 501(c)(3) to determine whether a religious organization is tax exempt may also be utilized to determine whether contributions to an organization are deductible under section 170(c), because the requirements of section 501(c)(3) parallel those of section 170(c). See Calvin K. of Oakknoll v. Commissioner,69 T.C. 770 (1978), affd. without published opinion 603 F. 2d 211 (2d Cir. 1979), cert. denied 444 U.S. 872↩ (1979). 26. In light of our holdings on the "private inurement" test and the "operational" test, it is not necessary to consider respondent's alternative contentions that the ULC-LRC was not "organized" for exempt purposes, sec. 170(c)(2)(B), or that petitioners retained dominion and control over the cash and property transferred to the church and thus did not make a "contribution" thereto within the meaning of section 170(c). See generally Davis v. Commissioner,81 T.C. 806, 815↩ (1983) (on appeal 9th Cir. June 25, 1984).
27. The equal protection clause of the Fourteenth Amendment applies to state, not Federal, actions. Jewell v. City of Covington,425 F. 2d 459 (5th Cir. 1970), cert. denied 400 U.S. 929 (1970). The due process clause of the Fifth Amendment, however, embodies the principles of equal protection. Bolling v. Sharpe,347 U.S. 497 (1954); United States v. Falk,479 F. 2d 616 (7th Cir. 1973); United States v. Thoresen,428 F. 2d 654↩ (9th Cir. 1970). For purposes of this opinion, we will refer to petitioners' argument as an equal protection argument.
28. Petitioners' request for $50,000 in attorney's fees, raised in their brief, must also be denied. This Court has no authority to grant such fees in this case. McQuiston v. Commissioner,78 T.C. 807 (1982), affd. without published opinion 711 F. 2d 1064 (9th Cir. 1983). We note that under section 7430, added to the Code by section 292(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 572, 1982-2 C.B. 462, 546-547, we now have authority to award reasonable litigation costs to a "prevailing party" in proceedings commenced in this Court after February 28, 1983. See also Rules 230-233, Tax Court Rules of Practice and Procedure. The petition in this case was filed July 24, 1981, and in any event petitioners are not the "prevailing party" herein. Respondent's request for damages under section 6673, also raised only in his brief, will also be denied in this instance. Respondent has conceded the partnership adjustment, and we cannot find that petitioners instituted these proceedings "merely" for delay under section 6673 as it read at the time this case was filed. Respondent did not determine a negligence addition under section 6653(a) in the notice of deficiency, although the facts as developed at the trial would no doubt support such an addition.↩